**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

In re:

DOUGLAS E. TURNER,                                    Bankruptcy Court Case No.
                                                      12-31211-KKS

     Alleged Debtor.

_____/


FARMERS & MERCHANTS BANK,

     Appellant/Petitioning Creditor,

v.                                                    District Court Case No.
                                                      3:13-cv-00498-MCR-CJK

DOUGLAS E. TURNER,

     Appellee/Alleged Debtor.

_____/


**<u>BRIEF OF APPELLANT FARMERS AND MERCHANTS BANK</u>**

Jacob D. Flentke, Esq.
Florida Bar No. 25482
Divine & Estes, P.A.
P.O. Box 3629
Orlando, Florida 32802-3629
Phone: (407) 426-9500
Fax: (407) 426-8030
E-Mail: jflentke@divineestes.com
Counsel for Farmers and Merchants Bank

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES.................................................................. iii

JURISDICTION........................................................................ 1

CITATIONS TO THE RECORD............................................................... 1

STATEMENT OF THE ISSUES.............................................................. 1

STANDARD OF REVIEW................................................................... 2

STATEMENT OF THE CASE................................................................ 4

    1.  NATURE OF THE CASE,
        PROCEEDINGS BELOW,
        AND DISPOSITION................................................... 4

    2.  FACTUAL BACKGROUND....................................................... 7

        A.  Relationship between Alleged Debtor
            and Turner Heritage Homes................................................. 7

        B.  Personal Judgments against Alleged Debtor.............................. 7

        C.  Confirmation of the Turner Heritage Homes
            Chapter 11 Plan.......................................................... 8

              i.  Class 4 – Farmers & Merchants Bank
                  Secured Claim.................................................. 8

              ii.  Class 10 – Deficiency Claims of Non-Participating
                  Secured Creditors and Judgment and
                  Non-Scheduled Claims........................................ 10

              iii. Class 12 – Friends & Family Claims............................ 10

        D.  Satisfaction and Discharge of
            Claims against Turner Heritage Homes.................................. 11

        E.  Fraudulent Transfers by Alleged Debtor................................ 13

ARGUMENT............................................................................... 14

   1.  THE BANKRUTPCY COURT
      INCORRECTLY INTERPRETED
      THE CHAPTER 11 PLAN AND
      CONFIRMATION ORDER............................…........................ 14

   2.  THE BANKRUTPCY COURT DID NOT
      GIVE THE CORRECT LEGAL EFFECT TO
      THE PERSONAL JUDGMENTS AGAINST THE
      ALLEGED DEBTOR.................…................................…............. 19

   3.  THE BANKRUTPCY COURT PUT THE
      BURDEN ON THE INCORRECT PARTY IN
      DETERMINING WHETHER THERE
      IS A BONA FIDE DISPUTE........................................... 22

   4.  THE BANKRUPTCY COURT APPLIED
      INCORRECT TEST IN DETERMINING
      WHETHER THERE IS A BONA FIDE
      DISPUTE AS TO AMOUNT.....................…...................... 23

   5.  THE BANKRUPTCY COURT'S FACTUAL
      FINDINGS ARE CLEARLY ERRONEOUS.................................. 29

       i.  The Chapter 11 Plan Establishes that the
         Claims of Petitioning Creditors Burk and
         Smith Were Not Fully Satisfied.......................................... 29

       ii.  The Chapter 11 Plan Establishes the Value
         of the Bank's Collateral.................................................. 32

      iii. There Is No Bona Fide Dispute that the
         Petitioning Creditors' Undisputed Claims
         Aggregate at Least $15,325................................................ 33

      iv. The Alleged Debtor Was Generally Not Paying
         His Debts as They Come Due............................................ 33

  6.  THE BANKRUPTCY COURT APPLIED
      INCORRECT TEST IN DETERMINING
      WHETHER THERE ARE SPECIAL
      CIRCUMSTANCES WARRANTING THE
      ENTRY OF AN ORDER FOR RELIEF........................................ 33

CONCLUSION.............................................................................. 34

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                    <u>Page</u>

*In re Applewood Chair Co.*,
    203 F.3d 914 (5th Cir. 2000)............................................................... 17

*In re Atlantic Portfolio Analytics & Management, Inc.*,
    380 B.R. 266 (Bankr. M.D. Fla. 2007)............................................. 21-23

*Binitie v. Heart*,
    No. 4:11-cv-275-SPM/WCS, 2012 WL 858587 (N.D. Fla. 2012)..................... 2

*In re Biogenetic Techs., Inc.*,
    248 B.R. 852 (Bankr. M.D. Fla. 1999)................................................. 22

*BankAtlantic v. Berliner*,
    912 So.2d 1260 (Fla. 4th DCA 2005)............................................... 20-21

*B.D.W. Assoc., Inc. v. Busy Beaver Bldg. Ctrs., Inc.*,
    865 F.2d 65, 66-67 (3d Cir. 1989)...................................................... 22

*CGO Investments, LLC v. AB Liquidating Corp.*,
    No. NC-06-1024-DBPa, 2006 WL 6810956 (9th Cir BAP 2006)................... 2

*In re Covington Prop., Inc.*,
    255 B.R. 77 (Bankr. N.D. Fla. 2000).................................................. 18

*In re Demirco Holdings, Inc.*,
    No. 06-70122, 2006 WL 1663237 (Bankr. C.D. Ill. June 9, 2006)................. 27-29

*In re Dow Corning Corp.*,
    280 F.3d 648 (6th Cir. 2002)........................................................... 18

*In re Duplan Corp.*,
    212 F.3d 144 (2d Cir. 2000)............................................................. 2

*In re Englander*,
    95 F.3d 1028 (11th Cir. 1996)........................................................... 2

*In re Euro-American Lodging Corp.*,
    357 B.R. 700 (Bankr. S.D.N.Y. 2007)................................................ 26

*In re General Trading, Inc.*,
    87 B.R. 216 (Bankr. S.D. Fla. 1988)................................................. 33

*In re Grubbs Constr. Co.*,
    328 B.R. 873 (Bankr. M.D. Fla. 2005)..................................................... 32

*In re Local Union 722 Int'l Brotherhood of Teamsters*,
    414 B.R. 443 (N.D. Ill. 2009)............................................................ 31

*In re Lost Key Plantation Limited Partnership*,
    367 B.R. 878 (Bankr. M.D. Fla. 2007).................................................. 31-32

*Matey v. Pruitt*,
    510 So.2d 351 (Fla. 2d DCA 1987)..................................................... 19-21

*Matter of 7H Land & Cattle Co.*,
    6 B.R. 29 (Bankr. D. Nev. 1980)......................................................... 34

*In re Miller*,
    489 B.R. 74 (Bankr. E.D. Tenn. 2013).................................................. 28

*In re Mt. Country Partners*,
    2012 WL 2394714 (Bankr. S.D. W. Va. June 25, 2102)............................. 29

*Munford v. Munford, Inc. (In re Munford, Inc.)*,
    97 F.3d 449 (11th Cir. 1996)............................................................ 18

*NCNB Texas Nat'l Bank v. Johnson*,
    11 F.3d 1260 (5th Cir. 1994)........................................................... 15-17

*In re New Midland Plaza Assoc.*,
    247 B.R. 877 (Bankr. S.D. Fla. 2000)................................................... 31

*In re Norris*,
    183 B.R. 437 (Bankr. W.D. La. 1995).................................................. 21, 34

*In re Optical Techs., Inc.*,
    425 F.3d 1294 (11th Cir. 2005)......................................................... 2-3

*Platinum Fin. Serv. Corp. v. Byrd (In re Byrd)*,
    357 F.3d 433 (4th Cir. 2004)............................................................ 22

*In re Prisuta*,
    121 B.R. 474 (Bankr. W.D. Pa. 1990)................................................. 21

*In re Ranch House of Orange-Brevard, Inc.*,
    773 F.2d 1166 (11th Cir. 1985)......................................................... 3

*Republic Supply Co. v. Shoaf,*
   815 F.2d 1046 (5th Cir. 1987)................................................. 17

*In re Regional Anesthesia Assoc., P.C.,*
   360 B.R. 466 (Bankr. W.D. Pa. 2007)................................... 25-26

*R.I.D.C. Indus. Dev. Fund v. P.L. Snyder,*
   539 F.2d 487 (5th Cir. 1976)............................................. 16-17

*Rimell v. Mark Twain Bank (In re Rimell),*
   946 F.2d 1363 (8th Cir. 1991)............................................... 22

*In re Roselli,*
   No. 12-32461, 2013 WL 828304 (Bankr. W.D.N.C. March 6, 2013)................. 29

*In re Rosenberg,*
   414 B.R. 826 (Bankr. S.D. Fla. 2009)................................... 24-26

*In re R.V. Seating, Inc.,*
   8 B.R. 663 (Bankr. S.D. Fla. 1981)......................................... 33

*In re Safety Harbor,*
   456 B.R. 703 (Bankr. M.D. Fla. 2011)...................................... 18

*Sergi v. Everett Savings Bank (In re Sergi),*
   233 B.R. 586 (1st Cir. BAP 1999).......................................... 2

*Sirius Computer Solutions, Inc. v. AASI Creditor Liquidating Trust,*
   No 10-23406-CIV, 2011 WL 3843943 (S.D. Fla. Aug. 29, 2011).................. 2-3

*In re Transit Group,*
   286 B.R. 811 (Bankr. M.D. Fla. 2002)...................................... 18

*In re Tucker,*
   No 5:09-bk-914, 2010 WL 4823917 (Bankr. N.D. W. Va. Nov. 22, 2010).......... 29

*United States v. Stribling Flying Service, Inc.,*
   734 F.3d 221 (5th Cir. 1984)............................................ 15-16

*Vernon v. Serv. Trucking, Inc.,*
   565 So.2d 905 (Fla. 5th DCA 1990)......................................... 21

*In re Vitro Asset Corp,*
   No. 11-32600-HDH-11, 2012 WL 6021475 (Bankr. N.D. Tex. Dec. 4, 2012)..... 24

**Statutes**

11 U.S.C. § 303...................................................................... 1-4, 23, 28, 30

11 U.S.C. § 524...................................................................... 15-17

11 U.S.C. § 1124.................................................................... 20-31

11 U.S.C. § 1141.................................................................... 13, 27

28 U.S.C. § 158...................................................................... 1

## JURISDICTION

The Bank is appealing a final order of the Bankruptcy Court.  This Court has appellate jurisdiction pursuant to 28 U.S.C. § 158(a)(1).

## CITATIONS TO THE RECORD

All citations to the record ("R.") are to the document numbers that were assigned by the Court's electronic filing system upon transmittal of the record to the District Court.  The record was transmitted in three Parts, and each Part has a number of Attachments.  Accordingly, all citations to the record identify the Part number and Attachment number.  For example, the Notice of Appeal will be cited as "R. 1-1," which is the "Document" number assigned by the Court's electronic case filing system in the blue heading at the top of each page of the record.

## STATEMENT OF THE ISSUES

1.      Whether the Bankruptcy Court erred with respect to its legal determination that the Amended Plan of Reorganization (R. 2-2, 2-3, 2-4; R. 2-5, "Chapter 11 Plan") and Order Confirming Amended Plan of Reorganization (R. 2-13, "Confirmation Order") in the bankruptcy case styled *In re Turner Heritage Homes, Inc.*, Case No. 11-40517-LMK (the "Chapter 11 Case") operated to satisfy, discharge, or otherwise relieve Alleged Debtor Douglas E. Turner of his obligations on personal judgments;

2.      Whether the Bankruptcy Court gave the correct legal effect to personal judgments that have been entered against Alleged Debtor Douglas E. Turner;

3.      Whether the Bankruptcy Court put the burden on the appropriate party to establish the presence of a "bona fide dispute," or lack thereof, under Section 303 of the United States Bankruptcy Code;[1]

---

[1] 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code").  All statutory references herein are to the Bankruptcy Code, unless otherwise indicated.

1

4.      Whether the Bankruptcy Court applied the correct test for determining whether there is a "bona fide dispute" as to amount under § 303;

5.      Whether the Bankruptcy Court's factual findings were clearly erroneous; and

6.      Whether the Bankruptcy Court applied the correct test for determining special circumstances warranting the entry of an order for relief under § 303.

## STANDARD OF REVIEW

In the bankruptcy context, the district court employs the same standard of review as the circuit court. *In re Optical Techs., Inc.*, 425 F.3d 1294, 1299-1300 (11th Cir. 2005). Accordingly, this Court "review[s] the bankruptcy court's findings of fact for clear error and its conclusions of law de novo." *In re Englander*, 95 F.3d 1028, 1030 (11th Cir. 1996); *see also Binitie v. Heart*, No. 4:11-cv-275-SPM/WCS, 2012 WL 858587, at *1 (N.D. Fla. 2012).

A confirmed Chapter 11 plan of reorganization is a binding contract between a debtor and its creditors and is therefore subject to the rules of contract interpretation. *Sergi v. Everett Savings Bank (In re Sergi)*, 233 B.R. 586, 589 (1st Cir. BAP 1999). Interpretation of a contract is generally a question of law subject to plenary review. *Id.*; *see also In re Duplan Corp.*, 212 F.3d 144, 151 (2d Cir. 2000) (stating that "[t]he Bankruptcy Court's interpretation of the Plan, the Confirmation Order, and the Final Decree are conclusions of law reviewed de novo"); *CGO Investments, LLC v. AB Liquidating Corp.*, No. NC-06-1024-DBPa, 2006 WL 6810956, at *3 (9th Cir BAP 2006) (explaining that a Chapter 11 plan should generally be treated as a contract, interpretation of which is subject to de novo review).

In some circumstances, when a bankruptcy court is interpreting its own confirmation order, a more deferential "abuse of discretion" standard may be appropriate. *Sirius Computer Solutions, Inc. v. AASI Creditor Liquidating Trust*, No 10-23406-CIV, 2011 WL 3843943, at *2-

2

3 (S.D. Fla. Aug. 29, 2011) (explaining that the bankruptcy court's interpretation of its own confirmation order was reviewed for abuse of discretion, but holding that a Chapter 11 plan is a contract). The rationale behind applying a more deferential standard of review when a bankruptcy court is interpreting its own order is based on the notion "'that the bankruptcy judge who has presided over a case from its inception is in the best position to clarify any apparent inconsistencies in the court's rulings.'" *In re Optical Techs., Inc.*, 425 F.3d at 1299-1300 (quoting *In re Ranch House of Orange-Brevard, Inc.*, 773 F.2d 1166, 168 (11th Cir. 1985)).

Here, however, a different Bankruptcy Judge presided over the Chapter 11 Case. The Honorable Lewis M. Killian, Jr., United States Bankruptcy Judge, presided over the Chapter 11 Case and signed the Confirmation Order (R. 2-13 at 12); the Honorable Karen K. Specie, United States Bankruptcy Judge, presided over the instant case. Accordingly, the rationale for applying the abuse of discretion standard does not apply, since the same bankruptcy judge has not presided over both proceedings. In other words, the Bankruptcy Court here is not interpreting its "own" order. Under the circumstances, the standard of review for the Bankruptcy Court's interpretation of the Chapter 11 Plan and Confirmation Order should be de novo.

Even if the abuse of discretion standard is applied with respect to the Bankruptcy Court's interpretation of the Chapter 11 Plan and Confirmation Order, such deference does not extend to other legal conclusions. "The rationale for deferring to a court's interpretation of its own order does not extend to its analysis of broad legal principles, and we decline to afford additional deference in this area." *In re In re Optical Techs., Inc.*, 425 F.3d at 1302-03. Accordingly, "[w]e must distinguish between those parts of the bankruptcy court's statements that interpret the confirmation order and those that merely analyze legal issues or constitute findings of fact." *Id.* at 1303. The issues in this case generally involve questions of law regarding broad legal

3

principles, such as the merger of a personal guaranty into a final judgment, the shifting burdens of proof under § 303, the appropriate legal standard for determining whether there is a bona fide dispute as to amount, and special circumstances for granting relief under § 303. These issues should be reviewed under a de novo standard.

## STATEMENT OF THE CASE

### 1.   Nature of the Case, Proceedings Below, and Disposition

This is an involuntary bankruptcy case arising under § 303 of the Bankruptcy Code. Pursuant to § 303, petitioning creditors are entitled to the entry of an order for relief if the requisite number of petitioning creditors show that their noncontingent, undisputed, unsecured claims aggregate at least $15,325, and the alleged debtor is generally not paying debts as they come due. *See* 11 U.S.C. §§ 303(b) and (h).[2] At issue in this case is the aggregate amount of the petitioning creditors' claims, and whether there is a bona fide dispute as to the amount of the petitioning creditors' claims.

The proceedings below were commenced on August 31, 2012, by the filing of an involuntary petition (R. 3-12, "Petition") under Chapter 7 against Alleged Debtor Douglas E. Turner (the "Alleged Debtor"). The Petition was filed by three petitioning creditors: Farmers and Merchants Bank (the "Bank"); Tema Burk, TTE, Tema Burk Revocable Intervivos Trust ("Burk"); and Susan C. Smith ("Smith") (collectively, the "Petitioning Creditors").

On October 1, 2012, the Alleged Debtor filed a Motion to Dismiss Involuntary Case (R. 3-11, "Motion to Dismiss"). On October 19, 2012, the Bank filed a Response of Certain Petitioning Creditor in Opposition to Alleged Debtor's Motion to Dismiss Involuntary Case and Incorporated Memorandum of Law (R. 3-6, "Response to Motion to Dismiss"). The main issue

---

[2] In accordance with Rule 8010(b), Federal Rules of Bankruptcy Procedure, the full text of § 303 is set forth in the Addendum attached hereto.

raised in the Motion to Dismiss is whether the Alleged Debtor's obligations to the Petitioning Creditors have been satisfied as part of the Chapter 11 Plan. Thus, resolution of the issues in this involuntary case requires reference to the Chapter 11 Plan and Confirmation Order in the Chapter 11 Case.

On May 28, 2013, the Bankruptcy Court held an evidentiary hearing on the Motion to Dismiss, a transcript of which has been filed with the Court and is part of the record on appeal (Doc. 6, "May 28, 2013 Transcript").[3]  The evidence presented during the May 28, 2013 trial is set forth below at pages 7-13.

On June 12, 2013, the Bank and the Alleged Debtor filed supplemental memoranda of law. *See* Alleged Debtor's Memorandum of Law in Support of Motion to Dismiss (R. 1-9); Bank's Memorandum of Law (R. 1-8).

On July 23, 2013, the Bankruptcy Court orally announced its ruling on the Motion to Dismiss. A transcript of the Court's ruling has been filed with the Court and is part of the record on appeal (Doc. 7, "July 23, 2013 Transcript").[4]  On July 30, 2013, the Bankruptcy Court entered a written Order Granting Alleged Debtor's Motion to Dismiss (R. 1-2, "Order").

The Bankruptcy Court held, according to the "unrefuted testimony at the trial," that the claims of Burk and Smith have been satisfied in full by the distributions under the Chapter 11 Plan. July 23, 2013 Transcript (Doc. 7) at 5. Specifically, the Bankruptcy Court found that the claims of Burk and Smith were satisfied "by the payment of shares of stock of the surviving company of that Chapter 11 case." *Id.*  The Bankruptcy Court further found that "there was absolutely nothing introduced into evidence or offered into evidence that refuted the claim [that] those creditors have been paid in full." *Id.* at 10.

---

[3] The May 28, 2013 Transcript has been filed on the District Court docket at Doc. 6.

[4] The July 23, 2013 Transcript has been filed on the District Court docket at Doc. 7.

With respect to the Bank, the Bankruptcy Court found a bona fide dispute as to the amount of the Bank's claim. The Bankruptcy Court framed the issue as "[w]hat, if anything, is still due and owing by the principal debtor Turner Heritage Homes, Inc. to the [B]ank, and thereby what is still due and owing by Mr. Turner to the [B]ank on account of the [B]ank's judgment." *Id.* at 16.

The Bankruptcy Court observed that, under the Chapter 11 Plan, "certain property [the Bank's collateral] was to be transferred in partial satisfaction of the debt of [the Bank]." *Id.* at 7. The Bankruptcy Court found that "[t]here was no evidence presented to this Court in conjunction with this involuntary case as to the value of the property transferred." *Id.* at 7. The Bankruptcy Court further found that "it was clear at the hearing, and based on the papers, that the bank did not present any evidence that it has given credit against the judgment amount for any property that was deeded to it under [the Chapter 11 Plan]." *Id.* The Bankruptcy Court explained that "the [Alleged D]ebtor doesn't dispute that the judgment was entered, nor does the [Alleged D]ebtor dispute the amount of the judgment. Here the [Alleged D]ebtor presented evidence that at least in part the judgment was paid, and that the [B]ank should have given credit for the property that was transferred to it as a result of the confirmation of a plan." *Id.* at 14. "Here the Court can't tell if the claim of the [B]ank has been fully or partially satisfied under the terms of the Turner Heritage Home, Chapter 11 case." *Id.* at 16. Based on the above findings, the Bankruptcy Court held that the Alleged Debtor had proven a bona fide dispute as to the amount of the Bank's claim. *Id.* at 7-8, 16. Accordingly, the Court granted the Motion to Dismiss and dismissed the Petition. The Bank timely appealed. *See* Notice of Appeal (R. 1-1).

6

2.     **Factual Background**

A.     **Relationship between Alleged Debtor Douglas Turner and Turner Heritage Homes**

Alleged Debtor Douglas E. Turner was previously a Director of Turner Heritage Homes, Inc. ("Turner Heritage Homes").  Statement of Financial Affairs from Chapter 11 Case (R. 2-9 at 53, ¶ 22(b)).[5]  The Alleged Debtor is a codebtor on the Turner Heritage Homes debt owed to the Bank.  Turner Heritage Homes Bankruptcy Petition Schedule G (R. 2-9 at 40).[6]  On June 29, 2011, Turner Heritage Homes filed its Chapter 11 Case.  Petition from Chapter 11 Case (R. 2-9 at 1);[7] May 28, 2013 Transcript (Doc. 6) at 14.

B.     **Personal Judgments against Alleged Debtor Douglas Turner**

While the Chapter 11 Case was pending, but before the Chapter 11 Plan was confirmed, the Petitioning Creditors all obtained personal judgments against the Alleged Debtor. Specifically, on December 16, 2011, judgment was entered in favor of Petitioning Creditor Burk against Alleged Debtor Douglas Turner and Fred Turner, jointly and severally, in the amount of $38,901.29 (the "Burk Judgment"); on November 18, 2011, judgment was entered in favor of Petitioning Creditor Smith against Alleged Debtor Douglas Turner and Frederick E. Turner, jointly and severally, in the amount of $50,683.76 (the "Smith Judgment"); and on November 8, 2011, judgment was entered in favor of the Bank against Alleged Debtor Douglas Turner, in the amount of $3,489,142.39 (the "Bank's Judgment") (collectively, the "Judgments").  Statement of

---

[5]  A copy of the Statement of Financial Affairs from the Chapter 11 Case begins on page 46 of Exhibit 2 to Farmer and Merchants Bank's Request to Take Judicial Notice (R. 2-9) at 46.  Farmer and Merchants Bank's Request to Take Judicial Notice was granted by the Bankruptcy Court during the May 28, 2012 evidentiary hearing on the Motion to Dismiss.  May 28, 2013 Transcript (Doc. 6) at 4.

[6]  The Turner Heritage Homes bankruptcy schedules were filed under penalty of perjury.  Schedules from Chapter 11 Case (R. 2-9 at 45).

[7]  A copy of the Turner Heritage Homes petition ("Turner Heritage Homes Petition") in the Chapter 11 Case is included in Exhibit 2 to Farmer and Merchants Bank's Request to Take Judicial Notice (R. 2-9) at 1.  At the time the Turner Heritage Homes Petition was filed, Louis Weltman was its President and one of two directors.  May 28, 2013 Transcript (Doc. 6) at 29.

Undisputed Facts (R. 3-1) at 1-2.[8]  The Judgments were based on personal guarantees executed by the Alleged Debtor, and all of the Judgments were entered against the Alleged Debtor, personally.  Statement of Undisputed Facts (R. 3-1) at 1-2; May 28, 2013 Transcript (Doc. 6) at 11-12.[9]  The Alleged Debtor acknowledged during the May 28, 2013 trial that the Judgments were his personal liability.  May 28, 2013 Transcript (Doc. 6) at 21.  None of the Judgments were appealed.  At the time the Chapter 11 Plan was confirmed, the Judgments were all final and nonappealable.

### C.     Confirmation of Turner Heritage Homes Chapter 11 Plan

On March 26, 2012, after the Judgments were entered against the Alleged Debtor, the Turner Heritage Homes Chapter 11 Plan was confirmed.[10]  *See* Confirmation Order (R. 2-13).  In accordance with the relevant provisions of the Bankruptcy Code, the Chapter 11 Plan categorized the various creditor claims into classes, as set forth in relevant part below.

#### i.     Class 4 – Farmers and Merchants Bank Secured Claim

The Bank's secured claim was placed in Class 4.  *See* Chapter 11 Plan (R. 2-5) at 12, ¶ 2.04(a) (stating that "Class 4 consists of the Secured Claim of Farmers & Merchant[s] Bank in the approximate amount of $1,100,000.00 secured by a first lien on the Heritage Hills Property").  Class 4 received the following treatment under the Chapter 11 Plan:

> The holder of the Allowed Class 4 Secured Claim at its election (x) be a Non-participating Secured Creditor and have its collateral returned to it upon

---

[8]  Copies of the Judgments are attached to the Bank's Response to Motion to Dismiss as Exhibits A, B, and C (R. 3-7, 3-8, and 3-9), as well as the Alleged Debtor's Request to Take Judicial Notice as Exhibits J, K, and L (R. 2-16). The Alleged Debtor's Request to Take Judicial Notice (R. 2-12) was granted during the May 28, 2013 hearing. May 28, 2013 Transcript (Doc. 6) at 4.

[9]  As indicated in the Statement of Undisputed Facts (R. 3-1), the personal guarantees were made in connection with debts of Heritage Hills Development Company, LLC ("Heritage Hills") and Summerchase, LLC ("Summerchase"), which entities were merged into Turner Heritage Homes.  The Alleged Debtor was the Managing Member of Heritage Hills and Summerchase.  May 28, 2013 Transcript (Doc. 6) at 10-11.

[10]  A copy of the Chapter 11 Plan is attached as Exhibit A to the Alleged Debtor's Notice of Supplemental Filing, filed May 31, 2013 (R. 2-2, 2-3, 2-4; R. 2-5).

order of the Court upon Motion by the holder of the Allowed Class 4 Secured Claim or upon confirmation of the Plan, or (y) be a Participating Secured Creditor and retain its Lien in the Heritage Hills Property to the extent of and limited to the value of its secured interest in the Heritage Hills Property, based on the $1,100,000.00 agreed upon value of the Heritage Hills Property as provided by the holder of the Allowed Class 4 Secured Claim.[11]  The Heritage Hills Property shall include the common elements of the Heritage Hills Property, which shall not be deeded to the Heritage Hills Subdivision Home Owner's Association, Inc. at the time of final confirmation of the Plan, such conveyance to be pursuant to the recorded Declaration of Covenants and Restrictions of the Heritage Hills Subdivision Homeowner's Association, Inc.  The agreed amount of the FMB Allowed Class 4 Secured Claim is estimated to be approximately $1,100,000.00, which amount shall be reduced with a closing of each of the forty-five (45) remaining lots at the Heritage Hills Property and the payment of $25,000, plus, in lieu of interest on the value of the secured interest, a payment equal to eleven (11%) percent of the sales price over $220,000.00 of each home constructed on one of the lots at the Heritage Hills Property, excluding options.  The Original Turner Shareholders shall continue to personally guarantee, on a limited basis, the performance by the Debtor.

Chapter 11 Plan (R. 2-5) at 12, ¶ 2.04(b) (emphasis deleted); *see also* May 28, 2013 Transcript (Doc. 6) at 34 (explaining how the Bank was to be treated under the Chapter 11 Plan).

With respect to Class 4, the Chapter 11 Plan specifically provides that "[t]he <u>Original Turner Shareholders shall continue to personally guarantee, on a limited basis, the performance by the Debtor</u>."  Chapter 11 Plan (R. 2-5) at 12, ¶ 2.04(b) (emphasis added).  Moreover, the Chapter 11 Plan specifically says that "<u>Class 4 is impaired</u>."  *Id.* at ¶ 2.04(c) (emphasis added).

Importantly, the parties agreed that the value of the Bank's collateral was $1.1 million. Chapter 11 Plan (R. 2-5) at 12, ¶ 2.04(b).  During the May 28, 2013 trial, Louis Weltman testified that there was "an agreed valuation between the parties . . . for purposes of the plan we agreed to the $1.1 million."  May 28, 2013 Transcript (Doc. 6) at 35, 43 (acknowledging that "the plan as confirmed called for $1.1 million to be placed on the value of the property").

---

[11]  The Bank elected to be a Nonparticipating Creditor under Class 4.  May 23, 2013 Transcript (Doc. 6) at 34.

ii.     **Class 10 – Deficiency Claims of Non-Participating Secured Creditors and Judgment and Non-Scheduled Claims**

The Bank's unsecured deficiency claim was placed in Class 10. *See* Chapter 11 Plan (R. 2-5) at 14, ¶ 2.10(a) (stating that "Class 10 consists of the Deficiency Claims of Non-participating Secured Creditors, Judgment Claims of previously secured creditors and Non-scheduled Creditors"); *see also* May 28, 2013 Transcript (Doc. 6) at 36. Class 10 received the following treatment under the Chapter 11 Plan:

> Holders of Allowed Class 10 Unsecured Deficiency, Judgment and Non-Scheduled Claims shall have such claims paid to the Allowed Class 10 Unsecured Deficiency, Judgment and Non-Scheduled Claims in common stock of the Phoenix (the "Phoenix Shares") aggregating a five (5%) percent equity stake in Phoenix to be shared proportionately by the holders of the Allowed Class 10 Unsecured Deficiency, Judgment and Non-Scheduled Claims. The Debtor estimates that these Allowed Class 10 Unsecured Deficiency, Judgment and Non-Scheduled Claims will total approximately $8,973,000.00, excluding the value of the disputed, contingent and unliquidated claims of Commercial.

Chapter 11 Plan (R. 2-5) at 14, ¶ 2.10(b).

The Chapter 11 Plan specifically states that "Class 10 claims are impaired." Chapter 11 Plan (R. 2-5) at 14, ¶ 2.10(c) (emphasis added).

iii.     **Class 12 – Friends & Family Claims**

The claims of Petitioning Creditors Smith and Burk were placed in Class 12. May 28, 2013 Transcript (Doc. 6) at 33-34, 37; *see also* Chapter 11 Plan (R. 2-5) at 15, ¶ 2.12(a) (stating that "Class 12 consists of the unsecured Friends & Family Claims"). Class 12 received the following treatment under the Chapter 11 Plan:

> Holders of Allowed Class 12 Unsecured F & F Claims shall have such claims paid at the election of the holders of the Allowed Class 12 Unsecured F & F Claims (i) in common stock of Phoenix (the "F & F Phoenix Shares") aggregating a five (5%) percent equity stake in Phoenix to be shared proportionately by the holders of the Allowed Class 12 Unsecured F & F claimants, or (ii) an aggregate payment equal to One Hundred and Five Thousand One Hundred and Seventy-Five Dollars ($105,175.00), or Ten (10%) percent of

10

the claim of each claimant in this Class comprised of a cash payment equal to Five Thousand One Hundred and Seventy-Five Dollars ($5,175.00) upon confirmation of the Debtor's Plan to be shared proportionately by the holders of the Allowed Class 12 Unsecured F & F claimants and a total of One Hundred Thousand Dollars ($100,000.00 to the holders of the Allowed Class 12 Unsecured F & F Claims based on the following: Two Hundred and Fifty Dollars ($250.00) for each unimproved lot sold by the Debtor at the time of such closing and Seven Hundred and Fifty ($750.00) for each home sold by the Debtor, such payments to continue for a period of ten (10) years following the Effective Date. The Debtor estimates that these Allowed Class 12 Unsecured F & F Claims will total approximately $1,051,747.14.

Chapter 11 Plan (R. 2-5) at 15, ¶ 2.12(b).

The Chapter 11 Plan specifically states that "Class 12 claims are impaired." Chapter 11 Plan (R. 2-5) at 15, ¶ 2.12(c) (emphasis added). "Each of the claimants in this class received a pro rata share of the 5 percent of Phoenix that was issued in satisfaction of these claims." May 28, 2013 Transcript (Doc. 6) at 37. There are approximately twenty (20) members of Class 12, including Petitioning Creditors Smith and Burk. *Id.* at 33-34.

With respect to the value of the stock in Phoenix,[12] the only evidence as to its value was vague testimony that "I believe it has value, yes." May 28, 2013 Transcript (Doc. 6) at 40.

### D.    Satisfaction and Discharge of Claims against Turner Heritage Homes

As is typical in Chapter 11 generally, the Chapter 11 Plan here provides that the distributions thereunder would satisfy and discharge the claims against debtor Turner Heritage Homes. Importantly, however, the Chapter 11 Plan does not provide for satisfaction of the obligations of the guarantors.

---

[12] Phoenix Realty Partners, Inc. is the equity holder of the Turner Heritage Homes and owns 100% of its common stock. Statement of Financial Affairs from Chapter 11 Case (R. 2-9) at 53, ¶ 21(b), filed in the Turner Heritage Homes, Inc. Chapter 11 Case. So, the Phoenix stock is essentially an ownership interest in the reorganized Turner Heritage Homes. Phoenix was also the "Plan Proponent." Chapter 11 Plan (R. 2-5) at ¶ 1.62.

Specifically, in Paragraph 2.16, the Chapter 11 Plan provides that the distributions would satisfy, release, and discharge the claims against debtor Turner Heritage Homes and the bankruptcy Estate:

> The treatment of and the consideration received by the holders of the Claims and Interests pursuant to this Article 2 of the Plan shall be in full satisfaction, release and discharge of their respective Claims against, or Interests in, the Debtor and the Estate.[13]

Chapter 11 Plan (R. 2-5) at 16, ¶ 2.16 (emphasis added). Paragraph 2.16 does not provide that the claims against guarantors or other nondebtors would be satisfied, released, or discharged.

Similarly, in Paragraph 4.13, the Chapter 11 Plan provides that the distributions would be in complete satisfaction of the claims against the bankruptcy estate; it does not provide that the distributions would be in complete satisfaction of the claims against the guarantors or any other nondebtors:

> The distributions and rights provided under this Plan will be in complete satisfaction and release, effective as of the Effective Date, of all Claims against and Interests in the Debtor's Estate and all liens upon any Property of the Estate.

Chapter 11 Plan (R. 2-5) at 20, ¶ 4.13 (emphasis added).

The Confirmation Order reiterates that the payments under the Chapter 11 Plan would satisfy the obligations of the Debtor, not the obligations of the guarantors or any other nondebtor:

> All full or partial payments made by the Debtor and received by the holder of a Claim before the Effective Date shall be deemed to be payments under the Amended Plan for purposes of satisfying the obligations of the Debtor pursuant to the Amended Plan.

Confirmation Order (R. 2-13) at 8, ¶ 12 (emphasis added).

The Confirmation Order also specifically provides that "[c]onfirmation of the Amended Plan shall not operate as res judicata with respect to the effect of the merger of Heritage Hills

---

[13] "The commencement of a case under section 301, 302, or 303 of this title creates an estate." 11 U.S.C. § 541(a). Stated generally, the property of the estate consists of all nonexempt property of the debtor. *See id.*

Development Company, LLC on the individual members of Heritage Hills Development Company, LLC." Confirmation Order (R. 2-13) at 8, ¶ 9 (emphasis added). The Alleged Debtor was the Managing Member of Heritage Hills. May 28, 2013 Transcript (Doc. 6) at 10-11. As explained below at pages 31-32, a Chapter 11 plan is typically res judicata as to the parties with respect to the contents of the plan. *See* 11 U.S.C. § 1141(a) (providing that a Chapter 11 plan is binding on the debtor, equity security holders, and creditors). The Chapter 11 Plan here specifically carves out the claims against the individual members of Heritage Hills from the res judicata effect. As a result, this language effectively preserves all claims against the individual members of Heritage Hills, including the guaranty claim against the Alleged Debtor.

### E. Fraudulent Transfers by Alleged Debtor Douglas Turner

Understanding that much of its claim against Turner Heritage Homes would be discharged in the Chapter 11 Case, the Bank turned its collection efforts towards Alleged Debtor Douglas Turner. The Bank discovered that the Alleged Debtor fraudulently transferred at least $1,400,000 to an offshore trust in the Cook Islands. The relevant portions of the deposition are included in the record on appeal. *See* Transcript of July 23, 2012 Deposition of Douglas E. Turner (R. 3-10 "July 23, 2012 Deposition Transcript") at 14-17 (admitting to making the transfers to the offshore trust). At no point during the July 23, 2012 Deposition, or at any other time prior to the commencement of this involuntary case, did the Alleged Debtor ever assert that his personal liability under the Judgments had been satisfied through the Chapter 11 Case. *See* May 28, 2013 Transcript (Doc. 6) at 21, 23-24 (confirming that the Alleged Debtor never asserted that his personal obligations under the guarantees or Judgments had been satisfied through the Chapter 11 Case).

13

## ARGUMENT

The Bankruptcy Court's Order Granting Alleged Debtor's Motion to Dismiss should be reversed, and this case should be remanded with instructions to enter an order for relief, for six different reasons: (1) the Bankruptcy Court misinterpreted the Chapter 11 Plan, as the payments under Chapter 11 Plan did not satisfy or discharge the Alleged Debtor's personal liability on the Judgments; (2) the Bankruptcy Court failed to give the correct legal effect to the personal Judgments that were entered against the Alleged Debtor; (3) the Alleged Debtor failed to carry his burden to show a bona fide dispute as to the amount of the claims of the Petitioning Creditors; (4) the Bankruptcy Court applied an incorrect legal standard for determining whether there is a bona fide dispute as to amount; (5) the Bankruptcy Court's factual findings are clearly erroneous with respect to its findings (i) that the claims of Burk and Smith had been satisfied in full by the distributions under the Chapter 11 Plan; (ii) that there was no evidence as to the value of the property transferred; (iii) that there is a bona fide dispute as to the amount of the Bank's claim; and (iv) its failure to find that the Alleged Debtor is generally not paying his debts as they become due; and (6) the Bankruptcy Court applied an incorrect legal standard for determining whether there are special circumstances that warrant the entry of an order for relief.

1.   **The Bankruptcy Court Incorrectly Interpreted the Chapter 11 Plan and Confirmation Order**

While the payments under the Chapter 11 Plan may have "satisfied" and discharged the obligations of Turner Heritage Homes and its bankruptcy estate, neither the Chapter 11 Plan nor the Confirmation Order suggest in any way that they would satisfy the obligations of guarantors, much less satisfy personal judgments against nondebtors. Nowhere does the Chapter 11 Plan or Confirmation Order provide that claims against the guarantors or any other nondebtors would be satisfied. The only language in the Chapter 11 Plan and Confirmation Order that even mentions

14

guarantors is ¶ 2.04(b) of the Chapter 11 Plan, which states that "[t]he Original Turner Shareholders shall continue to personally guarantee, on a limited basis, the performance of the Debtor." If anything, this language suggests that the guarantors would remain liable.

The language of the Chapter 11 Plan set forth above must be interpreted within the appropriate legal framework, a framework in which nondebtors do not receive a discharge under a Chapter 11 plan. Section 524(e) specifically provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."

Longstanding precedent establishes that "[t]he discharge of a debtor in reorganization proceedings does not affect a guarantor's liability." *NCNB Texas Nat'l Bank v. Johnson, et al.*, 11 F.3d 1260, 1266 (5th Cir. 1994) (citations omitted). A contrary rule "would defeat the purpose of loan guaranties; after all, a lender obtains guaranties specifically to provide an alternative source of repayment in the event that the primary obligor's debt is discharged in bankruptcy." *Id.* (noting further that "there has been no accord and satisfaction, simply because there has been no accord. Reorganization proceedings are judicial, not contractual, even where a secured creditor voluntarily participates"); *see also United States v. Stribling Flying Service, Inc.*, 734 F.3d 221 (5th Cir. 1984) (observing that § 524(e) precludes the argument that nondebtors receive a discharge, citing various cases in which similar contentions were generically rejected, and concluding with "little difficulty" that the obligation of the guarantors "was not affected by confirmation of the reorganization plan by which the corporate debt was restructured and reduced, nor by the participation of the creditor . . . in the Chapter XI proceedings that resulted in such restructuring and reduction of the corporate debt").

The Alleged Debtor attempts to avoid this well-established law by latching on to the above language in the Chapter 11 Plan, providing that the distributions under the Chapter 11 Plan would satisfy the obligations of debtor Turner Heritage Homes.  However, such language is typical for Chapter 11 plans and confirmation orders generally.  Such language makes clear that the claims against the debtor are discharged and furthers the debtor's "fresh start."  Courts have strongly rejected arguments that such language operates to satisfy or discharge the obligations of guarantors or other nondebtors.

In *R.I.D.C. Indus. Dev. Fund v. P.L. Snyder*, 539 F.2d 487, 490 n.3 (5th Cir. 1976), the relevant language provided that any indebtedness remaining after the distributions would be "cancelled, discharged, and extinguished."  The district court held that the inclusion of these words "expressed an intent to 'absolutely annihilate' the debt."  *Id.*  The debtor argued that "discharge of the debt instead of the debtor eliminates the underlying debt, thus preventing the creditor from having recourse to the guarantor."  *Id.*  The United States Court of Appeals for the Fifth Circuit rejected both readings, observing that "[o]ne of the primary purposes of obtaining a guarantor to a note is to provide an alternative source of repayment in the event that the principal obligor's debt is discharged in bankruptcy."  *Id.* at 491 (relying on language in the old Bankruptcy Act that is similar to the present version of § 524(e) of the Bankruptcy Code).

The argument advanced by the Alleged Debtor here is virtually identical to the argument that was soundly rejected by the Fifth Circuit in *R.I.D.C.*  The reasoning of the Fifth Circuit in *R.I.D.C.* was reaffirmed under the present language of the Bankruptcy Code in *Stribling*, 734 F.2d at 223 (quoting *R.I.D.C.* for the proposition that "[t]he arrangement does not affect the responsibility of [the corporations'] guarantors to make good on the unpaid portion of the

16

guaranteed debts that remain after the arrangement is completed"); *see also NCNB Texas Nat'l Bank*, 11 F.3d at 1266 (relying on *R.I.D.C.*).

Thus, merely including language in a Chapter 11 plan saying that the debtor's obligations are "satisfied" is not effective to relieve the guarantors of their obligations. When a plan of reorganization under Chapter 11 releases a guarantor, it does so clearly and expressly. *Cf. Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1054 (5th Cir. 1987) (holding that the following language was effective to release a guarantor: "[the] release shall include the release of any guarantees given to any creditor of the debtor which guarantees arose out of the debtor's business dealings with any creditor of the debtor . . ."). There is no such language in the Chapter 11 Plan here. In fact, the Chapter 11 Plan here specifically provides that "[t]he Original Turner Shareholders shall continue to personally guarantee, on a limited basis, the performance of the Debtor," Chapter 11 Plan (R. 2-5) at ¶ 2.04(b), and the Confirmation Order provides that "[c]onfirmation of the Amended Plan shall not operate as *res judicata* with respect to the effect of the merger of Heritage Hills Development Company, LLC on the individual members of Heritage Hills Development Company, LLC." Confirmation Order (R. 2-13) at 8, ¶ 9. The only language in the Chapter 11 Plan and Confirmation Order that addresses the guarantors indicates that they would remain liable. *Cf. In re Applewood Chair Co.*, 203 F.3d 914, 918 (5th Cir. 2000) (explaining that the release in *Shoaf* was specific and explicit, unlike general releases which were insufficient and ineffective to release or discharge claims against guarantors and other nondebtors). The lack of such language in the Chapter 11 Plan here shows that the personal Judgments against the Alleged Debtor were not satisfied, released, or discharged by the Chapter 11 Plan and Confirmation Order.

17

In addition, the Bankruptcy Code already provides a statutory framework for imposing an injunction to bar actions against nondebtors. *See* 11 U.S.C. § 524(g)(4)(A)(ii). Section 524(g)(4)(A)(ii) sets forth very particular, specific requirements to obtain such an injunction. For example, the third party must be "identifiable from the terms of such injunction (by name or as a part of an identifiable group)." Here, the Chapter 11 Plan does not identify the Alleged Debtor by name or as part of any group, and none of the other requirements of § 524(g)(4)(A)(ii) have been met. Furthermore, the requirements for a "bar order," "channeling injunction," or other forms nondebtor release under the case law were never raised or even attempted to be met in the Chapter 11 Case. *See, e.g., Munford v. Munford, Inc. (In re Munford, Inc.)*, 97 F.3d 449 (11th Cir. 1996) (holding that nondebtors may be granted a release under certain specified circumstances); *In re Transit Group*, 286 B.R. 811, 817-18 (Bankr. M.D. Fla. 2002) (identifying factors for determining whether to grant third-party release, including whether the bankruptcy court made a record of specific factual findings that support its conclusions); *see also In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002); *In re Safety Harbor*, 456 B.R. 703 (Bankr. M.D. Fla. 2011). Judge Killian considered a third-party release in *In re Covington Prop., Inc.*, 255 B.R. 77 (Bankr. N.D. Fla. 2000) (Killian, B.J.) (refusing to grant nondebtor releases to the debtor's principals). The fact that the Bankruptcy Court in the Chapter 11 Case here never addressed any of the required factors indicates that such nondebtor releases were not granted.

In sum, the language of the Chapter 11 Plan and Confirmation Order must be read in the context of well-established law that nondebtors generally do not receive a discharge. In that light, nothing in the Plan even remotely suggests that the personal Judgments against the Alleged Debtor would be satisfied, or that the personal obligations of any other nondebtors would be

18

satisfied. The release of the Alleged Debtor from his personal liability under the Judgments is simply not accomplished by the fortuitous use of the word "satisfy" in the Chapter 11 Plan of Turner Heritage Homes.

> ### 2. The Bankruptcy Court Did Not Give the Correct Legal Effect to the Personal Judgments against the Alleged Debtor

It is important to emphasize that the Alleged Debtor is no longer merely a guarantor. Prior to confirmation of the Chapter 11 Plan, the Petitioning Creditors all obtained personal Judgments against the Alleged Debtor, individually. The Bankruptcy Court erroneously relied on *Matey v. Pruitt*, 510 So.2d 351 (Fla. 2d DCA 1987) in holding that the Alleged Debtor's obligations under his personal guarantees were satisfied when the Petitioning Creditors received distributions under the confirmed Chapter 11 Plan. Because the Petitioning Creditors here obtained personal Judgments against the Alleged Debtor prior to confirmation, and those Judgments were not paid in full, any reliance on *Matey* is misplaced.

Indeed, *Matey* is completely inapposite. In *Matey*, there were two primary obligors on a note. *Matey*, 510 So.2d at 352-53. One of the primary obligors had a personal guarantor. *Id.* The obligors lost at trial and appealed. *Id.* In connection with the appeal, one of the obligors posted a supersedeas bond. *Id.* When the obligors lost the appeal, the supersedeas bond was used to satisfy the judgment in full. *Id.* The obligors and guarantor then disputed their respective obligations with respect to the judgment. *Id.*

The District Court of Appeal for the Second District of Florida simply observed the unremarkable proposition that an obligation under a personal guarantee "is merely collateral to another contractual duty and the guarantor's duty to perform only arises on default of the debtor." *Id.* at 353 (citation omitted). "Hence, once the debtor's obligation has been paid or otherwise satisfied, the guarantor's obligation is terminated." *Id.* Accordingly, the Second DCA

19

concluded that the responsibility for the judgment should be shared equally between the two obligors, not split three ways with the guarantor. In other words, the *Matey* court "held that once the debtor's obligation had been satisfied, the debtor could not then collect contribution from the guarantor." *BankAtlantic v. Berliner*, 912 So.2d 1260, 1263 (Fla. 4th DCA 2005).

In contrast to *Matey*, there is no evidence here that the Judgments have been paid in full (as explained in detail below at pages 30-32). The circumstances here are more like *BankAtlantic v. Berliner*, 912 So.2d 1260 (Fla. 4th DCA 2005). *Berliner* explains in detail how the liability on a personal guaranty merges into the judgment thereon, thus becoming a primary liability of the guarantor.

In *Berliner*, a corporation was the primary obligor on two promissory notes. *Berliner*, 912 So.2d at 1261. The corporate debt was guaranteed by two individuals. *Id.* When the corporation defaulted on the notes, the creditor sued the obligor and both guarantors in the same action. *Id.* The obligor and one of the guarantors settled with the creditor. *Id.* The second guarantor was dismissed without prejudice. *Id.* After the settling obligor and guarantor defaulted on the settlement agreement, the creditor sued the second guarantor. *Id.* The creditor then obtained a judgment against the second guarantor. *Id.* After the creditor obtained the judgment against the second guarantor, the creditor settled with the primary obligor and other guarantor. *Id.* In accordance with the settlement, the creditor filed and recorded a satisfaction with respect to the obligor and settling guarantor, stating that the judgment against the obligor and settling guarantor had been satisfied in full. *Id.* The second guarantor was not a party to the settlement. *Id.*

The creditor continued its collection efforts against the remaining guarantor through a garnishment proceeding. *Id.* The guarantor challenged the enforceability of the judgment and

20

moved to compel the entry of a satisfaction of judgment. *Id.* at 1262. The creditor argued that the release of the obligor and settling guarantor did not release the second guarantor. *Id.*

The court defined the issue as "whether a guarantor against whom a final judgment has been obtained remains liable on the debt guaranteed, once a satisfaction of judgment has been filed in favor of the obligor and another guarantor." *Id.* After surveying the case law—and distinguishing *Matey*—the Fourth District Court of Appeal held that once the judgment became final, the underlying cause of action lost its identity (that is, merged into the judgment), so that the guarantor was no longer a mere guarantor, but rather became primarily liable on the debt. *Id.* at 1264. Accordingly, the Fourth DCA concluded that the guarantor remained liable. *Id.* at 1264; *see also Vernon v. Serv. Trucking, Inc.*, 565 So.2d 905 (Fla. 5th DCA 1990) (explaining that "[t]he release of one does not release the others").[14]

That is the situation here. The personal Judgments against the Alleged Debtor were obtained prior to the satisfaction and discharge under the Chapter 11 Plan. Accordingly, the Judgments merge with the guarantees, so that the Alleged Debtor is primarily liable on the Judgments.[15] Those Judgments have not been paid in full (see below at 29-32). To the extent this liability may have been reduced as a result of distributions under the Chapter 11 Plan, the burden was on the Alleged Debtor to show the amount that his primary liability under the Judgments was reduced. *See In re Atlantic Portfolio Analytics & Management, Inc.*, 380 B.R.

---

[14] *In re Prisuta*, 121 B.R. 474 (Bankr. W.D. Pa. 1990), on which the Bankruptcy Court relied, is distinguishable. In *Prisuta*, the court found that the petitioning creditor had tortiously interfered with the alleged debtor's contractual rights, a fact absent from this case. *Prisuta*, 121 B.R. at 477. Moreover, *Prisuta* has been described as "an aberration in the law and very fact specific." *In re Norris*, 183 B.R. 437, 454 (Bankr. W.D. La. 1995) (observing further that the *Prisuta* court "strained for a result favorable for the debtors").

[15] The Bankruptcy Court framed the issue as follows: "that is precisely the issue. What, if anything is still due and owing by the principal debtor Turner Heritage Homes, Inc. to the [B]ank, and thereby what is still due an owing by Mr. Turner to the [B]ank on account of the [B]ank's judgment." July 23, 2013 Transcript (Doc. 7) at 16. Respectfully, that is not the right question. The guarantees here have been converted to personal Judgments. The question should be what the Alleged Debtor owes under the Judgments.

266, 273 (Bankr. M.D. Fla. 2007) (explaining that, once the petitioning creditors establish a prima facie case, the burden shifts to the alleged debtor to show a bona fide dispute). Even if the burden were on the Petitioning Creditors in this regard, however, the Petitioning Creditors have carried this burden, as there is no bona fide dispute that that the Petitioning Creditors hold claims that aggregate at least $15,325, for the reasons explained below at 29-33.

### 3. The Bankruptcy Court Put the Burden on the Incorrect Party in Determining Whether there Is a Bona Fide Dispute.

"'Establishing the existence or absence of a bona fide dispute involves a shifting burden of proof.'" *In re Atlantic Portfolio Analytics & Management, Inc.*, 380 B.R. 266 (Bankr. M.D. Fla. 2007) (quoting *In re Biogenetic Techs., Inc.*, 248 B.R. 852, 856 (Bankr. M.D. Fla. 1999)). The petitioning creditors have the initial burden of establishing a prima facie case that a bona fide dispute does not exist as to liability or amount. *In re Atlantic Portfolio*, 380 B.R. at 273 (citing *Platinum Fin. Serv. Corp. v. Byrd (In re Byrd)*, 357 F.3d 433, 438 (4th Cir. 2004)). Once the petitioning creditors establish a prima facie case, the burden shifts to the alleged debtor to demonstrate that a bona fide dispute exists. *In re Atlantic Portfolio*, 380 B.R. at 273 (citing *In re Byrd*, 357 F.3d at 439; *Rimell v. Mark Twain Bank (In re Rimell)*, 946 F.2d 1363, 1363 (8th Cir. 1991)). A bona fide dispute exists "'[i]f there is a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to disputed facts . . . .'" *In re Atlantic Portfolio*, 380 B.R. at 273 (quoting *B.D.W. Assoc., Inc. v. Busy Beaver Bldg. Ctrs., Inc.*, 865 F.2d 65, 66-67 (3d Cir. 1989)).

Although the Bankruptcy Court recognized this standard, this standard was not actually applied. The Petitioning Creditors met their initial burden of making a prima facie case by showing that there was no bona fide dispute based on the Judgments. The burden then shifted to

the Alleged Debtor to show that the claims of the Petitioning Creditors were subject to bona fide dispute.

The Alleged Debtor attempted to carry its burden by showing that Petitioning Creditors Smith and Burk received fractional shares of nonsalable stock in a company emerging from bankruptcy, which the Alleged Debtor asserted paid his personal obligations in full. However, the only evidence in the record as to the value of the stock was the testimony of Lois Weltman, who merely testified that he "believe[s] it [the stock] has value, yes." July 23, 2013 Transcript (Doc. 7) at 40. Given that the Chapter 11 Plan specifically provides that Petitioning Creditors Smith's and Burk's claims were "impaired," Chapter 11 Plan (R. 2-5) at 15, ¶ 2.12(c), this nonexpert testimony is totally insufficient to create a bona fide dispute, much less show that the Smith Judgment and Burk Judgment have been fully paid. If the Alleged Debtor was asserting that the Judgments had been paid in full, the burden was on him to put on evidence to support this assertion. He failed to do so. The Bankruptcy Court erroneously put the burden on the Petitioning Creditors to show the stock's value, when that burden should have been on the Alleged Debtor. *See* July 23, 2013 Transcript (Doc. 7) at 10. Similarly, the Bankruptcy Court erroneously put the burden on the Bank to establish the value of its collateral, when that burden should have been on the Debtor. *See id.* at 7. The Bankruptcy Court even stated that it "can't tell if the claim of the [B]ank has been fully or partially satisfied under the terms of the Turner Heritage Home, Chapter 11 [C]ase." *Id.* at 16. If that is so, then the Alleged Debtor did not carry his burden.

    **4.**     **The Bankruptcy Court Applied Incorrect Test to Determine Whether there Is a Bona Fide Dispute as to Amount**

The Bankruptcy Court concluded that the Bank's claim is subject to bona fide dispute as to amount. July 23, 2013 Transcript (Doc. 7) at 6, 7-8, 14 (explaining that the Alleged Debtor

does not dispute the amount of the Judgments, only that the Alleged Debtor "presented evidence that at least in part the judgment was paid"), 16 (holding that "there's clearly a bona fide dispute as to the amount of the [B]ank's claim against Mr. Turner"). It appears the Bankruptcy Court concluded as a matter of law that <u>any</u> dispute as to amount will disqualify a petitioning creditor from being able to obtain an order for relief under § 303. That is not the manner in which § 303 should be applied.

By way of background, the Bankruptcy Code was amended in 2005. Among other changes, Congress added language into § 303 providing that relief should be ordered, "unless such debts are the subject of a bona fide dispute as to liability or amount." 11 U.S.C. § 303(h)(1). Courts have split on the impact of this change. *See In re Vitro Asset Corp*, No. 11-32600-HDH-11, 2012 WL 6021475, at *5 (Bankr. N.D. Tex. Dec. 4, 2012) (explaining the split among the courts and collecting cases). This appears to be an issue of first impression in this district.

In reaching its conclusion in this case, the Bankruptcy Court relied on *In re Rosenberg*, 414 B.R. 826 (Bankr. S.D. Fla. 2009). However, *Rosenberg* is distinguishable. It did not hold that <u>any</u> dispute as to amount will disqualify a petitioning creditor from obtaining relief under § 303. *Rosenberg* simply stated in dicta that "[s]ubstantial questions have been raised as to the validity and/or amount" of the claim. *Rosenberg*, 414 B.R. at 846. The case is unclear as to the dispute regarding the validity of the claim, the dispute as to the amount, the totality of the claim, and whether there was an undisputed portion of the claim in excess of the aggregate statutory limit.

*Rosenberg* involved a complicated series of securitization transactions. *Rosenberg*, 414 B.R. at 831-40. The *Rosenberg* court identified a number of bases for the denial of relief on the

24

involuntary petition. First, the *Rosenberg* court found that the petitioning creditors were not actually creditors of the alleged debtor and therefore lacked standing. *Id.* at 840-41 (concluding that "none of the Original Petitioning Creditors or Ashland Funding is a creditor of [alleged debtor] Rosenberg"). Second, the *Rosenberg* court found that the petitioning creditors were not the real parties in interest. *Id.* at 841 (stating that "the Original Petitioning Creditors, as well as Ashland Funding, are not the 'real party in interest' entitled to pursue any claims against [alleged debtor] Rosenberg . . ."). Third, the *Rosenberg* court found that the petitioning creditors were judicially estopped from pursuing the involuntary petition. *Id.* at 842-43. Fourth, the *Rosenberg* court determined that the petitioning creditors' claims were contingent, so that they did not qualify under § 303(b)(1). *Id.* at 844. Finally, the *Rosenberg* court found that "[s]ubstantial questions have been raised as to the validity and/or amount of the confessed judgment against Rosenberg." *Id.* at 846 (emphasis added).

The presence of a bona fide dispute as to amount was not the basis for the *Rosenberg* court's denial of relief under § 303. Rather, the *Rosenberg* court held that the petitioning creditors did not have any claims at all against the alleged debtor. As such, *Rosenberg* court did not actually hold that any dispute as to amount disqualifies the petitioning creditor, regardless of the amount of the undisputed portion of the claim. The *Rosenberg* court's comments regarding the legal standard for determining bona fide disputes as to amount are mere dicta.

Specifically, the *Rosenberg* court opined in dicta that "any dispute regarding the amount of the petitioning creditors' claims that arises from the same transaction and is part of the underlying claim renders the claim subject to a *bona fide* dispute." *Id.* at 846 (citing *In re Regional Anesthesia Assoc., P.C.*, 360 B.R. 466 (Bankr. W.D. Pa. 2007)). However, like *Rosenberg*, the denial of relief in *Regional Anesthesia* was not based on a finding that the

petitioning creditors' claims were partially disputed as to amount. *See Regional Anesthesia*, 360 B.R. at 470, 472. The decision in the *Regional Anesthesia* was actually based on the finding that the alleged debtor was "generally paying its obligations as they become due," other than the disputed claims. *Id.* at 477. The *Regional Anesthesia* case also found that the claim of one of the petitioning creditor's was "the subject of bona fide dispute as to liability or amount," *id.* at 472 (emphasis added), and that there were "numerous genuine issues of material fact" with respect to the claim of the other petitioning creditor. *Id.* at 477. Accordingly, the statements quoted in *Regional Anesthesia* regarding the appropriate standard for determining a bona fide dispute as to amount were also dicta. *See Regional Anesthesia*, 360 B.R. at 469-70.[16]

This "all-or-nothing" approach suggested in *Rosenberg* and *Regional Anesthesia* has been widely criticized. Under this approach, a bona fide dispute as to any amount—even one dollar—disqualifies a petitioning creditor from obtaining relief under § 303, regardless of the amount of the undisputed portion of the claim. The "all-or-nothing" approach has at least four problems.

First, it is inconsistent with the text of § 303. Specifically, § 303(b)(1) provides that relief should be ordered "if such noncontingent, undisputed claims aggregate at least $15,325 more than the value of any lien . . . ." 11 U.S.C. § 303(b)(1) (emphasis added). The phrasing suggests that claims should be separated into their disputed and undisputed portions, similar to the manner in which claims are bifurcated into their secured and unsecured portions under § 506. *Cf.* 11 U.S.C. § 506 (determination of secured status). In other words, the same creditor can have both disputed and undisputed claims. This reading is consistent with the Bankruptcy Code's definition of "claim" as a "right to payment, whether or not such right is reduced to

---

[16] *Regional Anestheisa*, in turn, cited *In re Euro-American Lodging Corp.*, 357 B.R. 700 (Bankr. S.D.N.Y. 2007). Again, those statements in *Euro-American Lodging* are dicta, as demonstrated by the fact that the court in *Euro-American Lodging* actually granted relief to the petitioning creditors. *See Euro-American Lodging Corp.*, 357 B.R. at 730.

judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, <u>disputed, undisputed</u>, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5) (emphasis added). Indeed, claims under the Bankruptcy Code are separated into different portions for claims allowance purposes. *See* 11 U.S.C. § 502(a) (providing for the allowance of claims or interests). The text of § 303(b)(1), when read in pari materia with the other provisions of the Bankruptcy Code, suggests that relief should be ordered when the "undisputed claims aggregate" at least $15,325.

Second, the legislative history does not support a change in the law so radical as the "all-or-nothing" approach represents. Nothing in the legislative history of § 303 suggests that Congress intended to change the law to deprive a petitioning of creditor of relief whenever an alleged debtor could show a dispute as to one dollar of a claim:

> The legislative history from 1984 shows a Congressional intent that the addition of the "bona fide dispute" phrase to the statute originally was intended to cover disputes as to both liability and amount. *See* 130 Cong. Rec. S7618 (daily ed. June 19, 1984) (remarks of Sen. Baucus). The addition of the words "as to liability and amount" in the 2005 amendments is compatible with that original intent and no legislative history was found to suggest otherwise. Prior to BAPCPA [Bankruptcy Abuse Prevention and Consumer Protection Act of 2005], some courts faced with "bona fide dispute" questions focused principally on liability issues. *See, e.g. In re Seko Investments, Inc.,* 156 F.3d 1005, 1008 (9th Cir.1998), *cert. denied* 526 U.S. 1066, 119 S.Ct. 1458 (1999). Thus, the amendment appears to clarify the prior legislative intent. With the dearth of committee comments and legislative history available to interpret BAPCPA, this Court cannot presume that Congress added the phrase "as to liability and amount" with the intent that the claims of involuntary petitioners must now be fully liquidated either by agreement or judgment so that no dispute exists as to any portion of such claims. Without clear legislative intent, this Court cannot presume such a change in the law and declines to do so.

*In re Demirco Holdings, Inc.,* No. 06-70122, 2006 WL 1663237, at *3 (Bankr. C.D. Ill. June 9, 2006).

Third, the "all-or-nothing" approach is inconsistent with Congressional intent. Collier on Bankruptcy, the leading bankruptcy treatise, has explained why the all-or-nothing approach is inconsistent with Congressional intent:

> Why would Congress want to disqualify a creditor whose claim is noncontingent and at least partially undisputed? Section 303's requirements regarding type and number of claims are an attempt to balance a debtor's interest in staying out of bankruptcy with the interest of creditors in putting a debtor into bankruptcy. Why shouldn't the undisputed, noncontingent portion of a petitioning creditor's claim count? Why disqualify the creditor in toto? Why effectively bar that creditor's access to the bankruptcy forum? Of course, as a practical matter, the prudent creditor will take the suggestion loudly whispered by some courts and simply assert the undisputed *non*-contingent portion of its claim.

2 Collier on Bankruptcy ¶ 303.1[2] (16th ed. 2011).

Fourth, the all-or-nothing approach has absurd results. Under such an approach, anyone could avoid the entry of an order for relief merely by showing a dispute as to one dollar, even if the undisputed portion of the claim is in the millions, as it is here. An alleged debtor could manufacture a bona fide dispute by, for example, claiming that a payment was lost in the mail, or that a payment was misapplied. Such an approach only invites mischief and manipulation. The absurd results flowing from this approach demonstrate that Congress could not have intended it.

The better reasoned view is articulated in *Demirco Holdings*. The *Demirco Holdings* court concluded that, "[f]or a bona fide dispute to be relevant, it must at least have the potential to reduce the total of petitioners' claims to an amount below the statutory threshold." *Id.*[17]

Numerous courts have followed *Demirco Holdings*. *In re Miller*, 489 B.R. 74, 82-83 (Bankr. E.D. Tenn. 2013) (explaining that "[i]f the court were to adopt the all-or-nothing analysis the [d]ebtor has argued, potentially no creditor would ever qualify to file an involuntary petition because an involuntary debtor would simply have to raise some issue disputing the amount of the

---

[17] The statutory threshold is currently $15,325.

claim in order to defeat the involuntary petition"); *In re Tucker*, No 5:09-bk-914, 2010 WL 4823917 (Bankr. N.D. W. Va. Nov. 22, 2010) (stating that "[t]he better reasoned authority suggests that a petitioning creditor is not disqualified even if a bona fide dispute exists regarding a portion of its claim") (emphasis in original); *see also In re Mt. Country Partners*, 2012 WL 2394714 (Bankr. S.D. W. Va. June 25, 2102); *In re Roselli*, No. 12-32461, 2013 WL 828304 (Bankr. W.D.N.C. March 6, 2013).

This Court should adopt the approach articulated in *Demirco Holdings* that a bona fide dispute as to amount does not disqualify a petitioning creditor from obtaining relief, so long as the undisputed portion of the claims exceed the minimum aggregate statutory threshold. The *Demirco Holdings* approach is more consistent with the text of § 303, it is more consistent with the legislative history, and it avoids the absurd result that a creditor with a $100 million claim is disqualified from obtaining relief under § 303 by an alleged debtor manufacturing a dispute as to one measly dollar.

### 5.    The Bankruptcy Court's Factual Findings Are Clearly Erroneous

The Bankruptcy Court clearly erred with respect to its factual findings that (i) the unrefuted testimony was that the claims of Burk and Smith had been satisfied in full by the distributions under the Chapter 11 Plan; (ii) there was no evidence as to the value of the Bank's collateral; (iii) there is a bona fide dispute as to whether the Petitioning Creditors' claims aggregate at least $15,325; and (iv) the failure to find that the Alleged Debtor is generally not paying his debts as they come due. Each is addressed in turn.

#### i.    The Chapter 11 Plan Establishes that the Claims of Petitioning Creditors Burk and Smith Were Not Fully Satisfied

The Bankruptcy Court found that the claims of Petitioning Creditors Burk and Smith had been paid in full. July 23, 2013 Transcript (Doc. 7) at 5, 10 (stating that "there was absolutely

29

nothing introduced into evidence or offered into evidence that refuted the claim [that] those creditors have been paid in full"). This finding is clearly erroneous for at least two reasons. First, for the reasons explained above, the Chapter 11 Plan did not satisfy or discharge the personal Judgments against the Alleged Debtor.

Second, there is no evidence that the claims of Petitioning Creditors Burk and Smith have been paid in full. The Bankruptcy Court erroneously relied on language under the Chapter 11 Plan and Confirmation Order stating that the distributions under the Chapter 11 Plan satisfy the Debtor's obligations. *See, e.g.,* Chapter 11 Plan at ¶ 2.16 (stating that the distributions under the Chapter 11 Plan would be "in full satisfaction, release, and discharge, of their claims against, Interests in, the Debtor and the Estate") (emphasis added). But that does not mean the claims were paid in full or that the Judgments were fully satisfied. In fact, the evidence of record shows that the distributions under the Chapter 11 Plan did not even come close to paying the amount of those claims in full. *See* Chapter 11 Plan (R. 2-5) at ¶ 2.12(c) (stating that "Class 12 claims are impaired"); May 28, 2013 Transcript (Doc. 6) hearing at 40 (stating that the fractional shares of stock that were distributed to Creditors Burk and Smith under the Chapter 11 Plan, which supposedly fully paid their claims, only "has value," without in any way establishing the amount).

To the extent that the distributions under the Chapter 11 Plan may arguably have reduced the amount of the claims of Petitioning Creditors Burk and Smith, those claims were in Class 12. May 28, 2013 Transcript (Doc. 6) at 33-34. The Chapter 11 Plan specifically states that the Class 12 claims are "impaired." Chapter 11 Plan (R. 2-5) at ¶ 2.12(c). Pursuant to § 1124, stated generally, a class of claims is impaired if the plan alters the creditors' rights.[18] In other words,

---

[18] Specifically, § 1124 provides as follows:

"[a]n impaired creditor class is a class whose claims are not unimpaired; unimpaired claims are those claims who are paid in full and in accordance with their original terms, including the cure of any defaults." *In re Local Union 722 Int'l Brotherhood of Teamsters*, 414 B.R. 443, 452 (N.D. Ill. 2009); *In re New Midland Plaza Assoc.*, 247 B.R. 877, 896 (Bankr. S.D. Fla. 2000) (determining that "if a class of claims is not paid in full with interest on the effective date, the class is impaired"). Because the Class 12 claims are impaired, they were not paid in full.

The finding in the Chapter 11 Plan that Class 12 claims are impaired is conclusive. "[T]he provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner of the debtor . . . ." 11 U.S.C. § 1141(a). "[A]n order confirming a plan in a Chapter 11 case constitutes a final judgment on the merits for res judicata purposes. A plan is binding upon all parties once it is confirmed and all questions that could have been raised pertaining to the plan are res judicata." *In re Lost Key Plantation Limited Partnership*, 367 B.R.

---

Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—
    (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or
    (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—
        (A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured;
        (B) reinstates the maturity of such claim or interest as such maturity existed before such default;
        (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;
        (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and
        (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

11 U.S.C. § 1124.

878 (Bankr. M.D. Fla. 2007) (internal quotation and citation omitted); *see also In re Grubbs Constr. Co.*, 328 B.R. 873, 879 (Bankr. M.D. Fla. 2005) (explaining that "[t]he preclusive res judicata effect of plan confirmation and transfers of property contemplated thereby apply equally to transfers to secured creditors") (citation omitted)). The Chapter 11 Plan is binding on the Alleged Debtor as a codebtor[19] and an equity security holder.

Accordingly, the finding in the Chapter 11 Plan that Class 12 claims are "impaired" conclusively establishes that the claims of Petitioning Creditors Burk and Smith were not in fact paid in full. Although the Bankruptcy Court found that the distributions of Phoenix stock under the Chapter 11 Plan fully paid the claims of these creditors, the only evidence as to the value of that stock was nonexpert testimony that it "has value[.]" May 28, 2013 Transcript (Doc. 6) at 40. It was clearly erroneous to find that this testimony established that fractional shares in a company emerging from bankruptcy fully paid the claims of Petitioning Creditors Burk and Smith, or that there was even a bona fide dispute in this regard. As explained below, the exact amount of the claims of Petitioning Creditors Burk and Smith is inconsequential, because the amount of the Bank's claim clearly exceeds the statutory minimum of an aggregate $15,325. *See* 11 U.S.C. § 303(b)(1).

ii.    **The Chapter 11 Plan Establishes the Value of the Bank's Collateral**

The Bankruptcy Court found that "[t]here was no evidence presented to this Court in conjunction with this involuntary case as to the value of the property transferred." *Id.* at 7. This factual finding is clearly erroneous. The Chapter 11 Plan specifically provides that the property has a "$1,100,000.00 agreed upon value," and that "[t]he agreed amount of the [Bank's] Allowed Class 4 Secured Claim is estimated to be approximately $1,100,000.00[.]" Chapter 11 Plan (R.

---

[19] The Alleged Debtor is listed on the Turner Heritage Homes Schedule G as a "Codebtor." R. 2-9 at 42.

2-5) at ¶ 2.04(b). As explained above, the Chapter 11 Plan is res judicata. In addition, Louis Weltman testified that there was "an agreed valuation between the parties . . . for purposes of the plan we agreed to the $1.1 million." May 28, 2013 Transcript (Doc. 6) at 35, 43 (acknowledging that "the plan as confirmed called for $1.1 million to be placed on the value of the property").

Given that the Bank's Judgment is in the amount of $3,489,142.39, and the Chapter 11 Plan establishes the value of the Bank's collateral as $1,100,000.00, there is no bona fide dispute that the Bank's claim is at least $2,389,142.39, plus interest. This amount is more than sufficient to meet the aggregate statutory minimum of $15,325. *See* 11 U.S.C. § 303(b)(1).

### iii. There is No Bona Fide Dispute that the Petitioning Creditors' Claims Aggregate at Least $15,325

Based on the foregoing, there is no bona fide dispute that the Petitioning Creditors have claims that aggregate at least $15,325. The Bankruptcy Court's finding to the contrary was clearly erroneous.

### iv. The Alleged Debtor Is Generally Not Paying His Debts as They Become Due

The Bank presented undisputed evidence that the Alleged Debtor was generally not paying his debts as they become due. May 23, 2013 Transcript (Doc. 6) at 27. The Bankruptcy Court clearly erred by failing to find that the Alleged Debtor generally is generally not paying his debts as they become due.

### 6. The Bankruptcy Court Erred by Failing to Find Special Circumstances Warranting the Entry of an Order for Relief

"'[A] sole creditor would be entitled to prevail in an involuntary case if the creditor can establish . . . there are special circumstances such as fraud.'" *In re General Trading, Inc.*, 87 B.R. 216, 219 (Bankr. S.D. Fla. 1988) (quoting *In re R.V. Seating, Inc.*, 8 B.R. 663, 665 (Bankr. S.D. Fla. 1981)). "Courts have granted involuntary relief where only a single creditor is not

33

being paid when it is demonstrated that:  1) special circumstances amounting to trick, fraud, artifice or scam were used to isolate the creditor, or that 2) the creditor cannot possibly obtain adequate relief outside the bankruptcy setting." *In re Norris*, 183 B.R. 437, 460 (Bankr. W.D. La. 1995) (citing *Matter of 7H Land & Cattle Co.*, 6 B.R. 29, 31 (Bankr. D. Nev. 1980) and collecting cases)).

Here, the Bank has submitted undisputed evidence that the Alleged Debtor has fraudulently transferred at least $1.4 million to an offshore trust.  July 23, 2012 Deposition Transcript (R. 3-10) at 14-17; May 28, 2013 Transcript (Doc. 6) at 19.  The Alleged Debtor offered no evidence to contradict these transfers or show that they were not fraudulent.  This evidence establishes that there are special circumstances which warrant the entry of an order for relief, even if there is only one petitioning creditor.  The Bankruptcy Court erred in failing to find special circumstances.

## CONCLUSION

For the foregoing reasons, the Bank respectfully requests that this Court reverse the Order of the Bankruptcy Court and remand this case with instructions to enter an order for relief under § 303.

Respectfully submitted this 26th day of September, 2013.

*/s/ Jacob D. Flentke*
Jacob D. Flentke, Esq.
Florida Bar No. 25482
Divine & Estes, P.A.
P.O. Box 3629
Orlando, Florida 32802-3629
Phone: (407) 426-9500
Fax: (407) 426-8030
E-Mail:  jflentke@divineestes.com
Counsel for Farmers and Merchants Bank

34

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of September, 2013, a true and correct copy of the foregoing was provided electronically via the Court's CM/ECF system or by U.S. Mail to the following:    the Alleged Debtor, Douglas E. Turner, c/o Ronald A. Mowrey, Esq., (rmowrey@mowreylaw.com), Mowrey Law Firm, P.A., 515 North Adams Street, Tallahassee, FL 32301-1111; Farmers & Merchants Bank c/o Ethan Andrew Way, Esq., (ethan@waylawfirm.com), Gillis Way LLP, P.O. Box 10017, Tallahassee, FL 32302; Tema Burk, TTE, c/o William R. Wohlsifer, Esq., (William@wohlsifer.com), William R. Wohlsifer, PA, 1100 East Park Ave., Suite B, Tallahassee, FL 32301; Susan C. Smith c/o Timothy Bruce Elliott, Esq. (tim@smithlawtlh.com), Smith & Associates, 2834 Remington Green Circle, Tallahassee, FL 32308; and U.S. Trustee, United States Trustee, 110 E. Park Avenue, Suite 128, Tallahassee, FL 32801.


*/s/ Jacob D. Flentke*
Jacob D. Flentke, Esq.
Florida Bar No. 25482

## ADDENDUM

Section 303 of the Bankruptcy Code provides as follows:

(a) An involuntary case may be commenced only under chapter 7 or 11 of this title, and only against a person, except a farmer, family farmer, or a corporation that is not a moneyed, business, or commercial corporation, that may be a debtor under the chapter under which such case is commenced.

(b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $15,325 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

(2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $15,325 of such claims;

(3) if such person is a partnership—

(A) by fewer than all of the general partners in such partnership; or

(B) if relief has been ordered under this title with respect to all of the general partners in such partnership, by a general partner in such partnership, the trustee of such a general partner, or a holder of a claim against such partnership; or

(4) by a foreign representative of the estate in a foreign proceeding concerning such person.

(c) After the filing of a petition under this section but before the case is dismissed or relief is ordered, a creditor holding an unsecured claim that is not contingent, other than a creditor filing under subsection (b) of this section, may join in the petition with the same effect as if such joining creditor were a petitioning creditor under subsection (b) of this section.

(d) The debtor, or a general partner in a partnership debtor that did not join in the petition, may file an answer to a petition under this section.

(e) After notice and a hearing, and for cause, the court may require the petitioners under this section to file a bond to indemnify the debtor for such amounts as the court may later allow under subsection (i) of this section.

(f) Notwithstanding section 363 of this title, except to the extent that the court orders otherwise, and until an order for relief in the case, any business of the debtor may continue to operate, and the debtor may continue to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced.

(g) At any time after the commencement of an involuntary case under chapter 7 of this title but before an order for relief in the case, the court, on request of a party in interest, after notice to the debtor and a hearing, and if necessary to preserve the property of the estate or to prevent loss to the estate, may order the United States trustee to appoint an interim trustee under section 701 of this title to take possession of the property of the estate and to operate any business of the debtor. Before an order for relief, the debtor may regain possession of property in the possession of a trustee ordered appointed under this subsection if the debtor files such bond as the court requires, conditioned on the debtor's accounting for and delivering to the trustee, if there is an order for relief in the case, such property, or the value, as of the date the debtor regains possession, of such property.

(h) If the petition is not timely controverted, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed. Otherwise, after trial, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if—

(1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount; or

(2) within 120 days before the date of the filing of the petition, a custodian, other than a trustee, receiver, or agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.

(i) If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—

(1) against the petitioners and in favor of the debtor for—

(A) costs; or

(B) a reasonable attorney's fee; or

(2) against any petitioner that filed the petition in bad faith, for—

(A) any damages proximately caused by such filing; or

(B) punitive damages.

b

(j) Only after notice to all creditors and a hearing may the court dismiss a petition filed under this section—

(1) on the motion of a petitioner;

(2) on consent of all petitioners and the debtor; or

(3) for want of prosecution.

(k)

(1) If—

(A) the petition under this section is false or contains any materially false, fictitious, or fraudulent statement;

(B) the debtor is an individual; and

(C) the court dismisses such petition, the court, upon the motion of the debtor, shall seal all the records of the court relating to such petition, and all references to such petition.

(2) If the debtor is an individual and the court dismisses a petition under this section, the court may enter an order prohibiting all consumer reporting agencies (as defined in section 603(f) of the Fair Credit Reporting Act (15 U.S.C. 1681a(f)) from making any consumer report (as defined in section 603(d) of that Act) that contains any information relating to such petition or to the case commenced by the filing of such petition.

(3) Upon the expiration of the statute of limitations described in section 3282 of title 18, for a violation of section 152 or 157 of such title, the court, upon the motion of the debtor and for good cause, may expunge any records relating to a petition filed under this section.