**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

In re:

DOUGLAS E. TURNER,                                   Bankruptcy Court Case No.
                                                      12-31211-KKS
     Alleged Debtor.

_____/


FARMERS & MERCHANTS BANK,

     Appellant/Petitioning Creditor,

v.                                                    District Court Case No.
                                                      3:13-cv-00498-MCR-CJK
DOUGLAS E. TURNER,

     Appellee/Alleged Debtor.

_____/



**REPLY BRIEF OF APPELLANT FARMERS & MERCHANTS BANK**

Jacob D. Flentke, Esq.
Florida Bar No. 25482
Divine & Estes, P.A.
P.O. Box 3629
Orlando, Florida 32802-3629
Phone: (407) 426-9500
Fax: (407) 426-8030
E-Mail: jflentke@divineestes.com
Counsel for Farmers and Merchants Bank

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES……………………………..…………………………….. iii

ARGUMENT……………………………………...………………………… 1

    1.  THE CHAPTER 11 PLAN ONLY SATISFIED
        THE OBLIGATIONS OF TURNER HERITAGE HOMES,
        NOT THE PERSONAL JUDGMENTS
        AGAINST THE ALLEGED DEBTOR………..…………………………… 1

    2.  THE PERSONAL JUDGMENTS ARE
        PRIMARY OBLIGATIONS OF THE
        ALLEGED DEBTOR THAT ARE NOT
        DEPENDENT ON THE CLAIMS AGAINST
        TURNER HERITAGE HOMES……………..……….….……………….. 7

    3.  THE ALLEGED DEBTOR FAILED TO CARRY
        ITS BURDEN TO SHOW A BONA FIDE DISPUTE………………………. 10

    4.  THE BANK HAS SHOWN SPECIAL CIRCUMSTANCES
        WARRANTING THE ENTRY OF AN ORDER FOR RELIEF……….……. 14

    5.  THE ALLEGED DEBTOR'S ALL-OR-NOTHING
        TEST FOR DETERMINING A BONA FIDE DISPUTE
        AS TO AMOUNT IS INCORRECT …………………………….……… 15

CONCLUSION……………………………………………………………… 18

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*In re Applewood Chair Co.,*
    203 F.3d 914 (5th Cir. 2000)...................................................... 3-4

*In re Atlantic Portfolio Analytics & Management, Inc.,*
    380 B.R. 266 (Bankr. M.D. Fla. 1999)....................................... 10

*BankAtlantic v. Berliner,*
    912 So.2d 1260 (Fla. 4th DCA 2005)......................................... 8-9

*In re Brewer,*
    No. 6:11-bk-4174-KSJ,
    2012 WL 2076421 (Bankr. M.D. Fla. March 25, 2011)............................. 12-13

*In re General Trading, Inc.,*
    87 B.R. 216 (Bankr. S.D. Fla. 1988)......................................... 14

*In re Graber,*
    319 B.R. 374 (Bankr. E.D. Pa. 2004)....................................... 9

*In re Local Union 722 Int'l Brotherhood of Teamsters,*
    414 B.R. 443 (Bankr. N.D. Ill. 2009)....................................... 10

*In re Lost Plantation Limited Partnership,*
    367 B.R. 878 (Bankr. M.D. Fla. 2007)....................................... 10

*Matey v. Pruitt,*
    510 So.2d 351 (Fla. 2d DCA 1987)......................................... 8-9

*N.C.N.B. Texas Nat'l Bank v. Johnson,*
    11 F.3d 1260, 1266 (5th Cir.1994)......................................... 6

*In re Norris,*
    183 B.R. 437 (Bankr. W.D. La. 1995)....................................... 9

*In re Prisuta,*
    121 B.R. 474 (Bankr. W.D. Pa. 1990)....................................... 11

*Republic Supply Co. v. Shoaf,*
    815 F.2d 1046 (5th Cir. 1987)......................................... 3-5

*R.I.D.C. Indus. Dev. Fund v. P.L. Snyder,*
    539 F.2d 487 (5th Cir. 1976)......................................... 6

*United States v. Stribling Flying Serv., Inc.,*
        734 F.2d 221 (5th Cir.1984)……………………………………………………… 4

**Statutes**

11 U.S.C. § 303……………………………………………………....... 13-14, 17

11 U.S.C. § 524…………………………………………………… 4

11 U.S.C. § 1124………………………………………………… 8, 10

Fed. R. Civ. P. 32……………………………………………… 14-15

**ARGUMENT**

The Bank[1] makes five main arguments in reply to the Answer Brief of Appellee Douglas E. Turner (Doc. 9, "Answer Brief"), which are more fully developed below:  (1) the distributions under the Chapter 11 Plan of Turner Heritage Homes only satisfied the obligations of Turner Heritage Homes, not the personal Judgments against the Alleged Debtor; (2) the satisfaction of the claims against Turner Heritage Homes under the Chapter 11 Plan did not operate to terminate the personal liability of the Alleged Debtor under the personal Judgments; (3) nonexpert testimony that the stock distributed under the Chapter 11 Plan "has value" failed to establish a bona fide dispute as to the amount of the Petitioning Creditors' claims; (4) the Alleged Debtor's admission that he transferred over $1 million to an offshore trust in the Cook Islands is sufficient to establish special circumstances warranting the entry of an order for relief; and (5) the Alleged Debtor's all-or-nothing approach for determining the existence of a bona fide dispute as to amount is incorrect.

1.  **The Plain Language of the Chapter 11 Plan Provides that Only the Obligations of Turner Heritage Homes Would Be Satisfied, Not the Personal Judgments against Alleged Debtor Douglas E. Turner**

The Alleged Debtor asserts on several occasions in his Answer Brief that the distributions under the Chapter 11 Plan were in "complete satisfaction of the debt."  Answer Brief at 5, 9, 12, 13, 16.[2]  This assertion is contrary to the plain language of the Chapter 11 Plan.  The Chapter 11 Plan specifically provides that the distributions under the Chapter 11 Plan would only satisfy the obligations of the corporate entity Turner Heritage Homes:

> The treatment of and the consideration received by the holders of the Claims and Interests pursuant to this Article 2 of the Plan shall be in full

---

[1]  All capitalized terms herein are as defined in the Brief of Appellant Farmers and Merchants Bank (Doc. 8, "Initial Brief").

[2]  Citations to page numbers of the Answer Brief and Initial Brief are to the page numbers at the bottom of the page cited.

satisfaction, release, and discharge of their respective claims against, or Interests in, the Debtor [Turner Heritage Homes] and the Estate [of Turner Heritage Homes].

Chapter 11 Plan (R. 2-5 at 16, ¶ 2.16) (emphasis added).[3]

The distributions and rights provided under this Plan will be in complete satisfaction and release, effective as of the Effective Date, of all Claims against and Interests in the Debtor's [Turner Heritages Homes] Estate and all liens upon any Property of the Estate.

Chapter 11 Plan (R. 2-5 at 20, ¶ 4.13) (emphasis added).

The Confirmation Order also clearly provides that the distributions under the Chapter 11 Plan only satisfied the obligations of Turner Heritage Homes:

All full or partial payments made by the Debtor and received by the holder of a Claim before the Effective Date shall be deemed to be payments under the Amended Plan for purposes of satisfying the obligations of the Debtor [Turner Heritage Homes] pursuant to the Amended Plan.

Confirmation Order (R. 2-13 at 8, ¶ 12) (emphasis added).

The emphasized language above is crucial to interpreting the Chapter 11 Plan correctly. This language makes clear that the only obligations that were satisfied under the Chapter 11 Plan were the obligations of Turner Heritage Homes and its bankruptcy estate, not the personal obligations of the Alleged Debtor. The Alleged Debtor does not address this critical language.

There is nothing in the Chapter 11 Plan that suggests that any claims against Douglas E. Turner or any other nondebtor guarantor would be satisfied. As the Bank pointed out in its Initial Brief at 14-15, the only language in the Chapter 11 Plan and Confirmation Order that mentions guarantors is ¶ 2.04(b) of the Chapter 11 Plan, which states that "[t]he Original Turner Shareholders shall continue to personally guarantee, on a limited basis, the performance of the Debtor." In addition, the Confirmation Order provides that "[c]onfirmation of the Amended Plan

---

[3] The "Estate" consists of the property of Turner Heritage Homes.  *See* Chapter 11 Plan (R. 2-5 at 6, ¶ 1.43) (defining the term "Estate" as "[t]he estate created in the Case pursuant to Section 541 of the Code"). Under § 541, the bankruptcy estate is comprised of the property of the debtor.

2

shall <u>not</u> operate as *res judicata* with respect to the effect of the merger of Heritage Hills Development Company, LLC <u>on the individual members of Heritage Hills Development Company, LLC</u>." Confirmation Order (R. 2-13) at 8, ¶ 19 (emphasis added).   Far from "satisfying" the obligations of the guarantors, this language suggests that the guarantors would remain liable.

In referring to this language, the Bank is simply observing that there is no language in the Chapter 11 Plan addressing any guarantees, except one sentence that suggests the guarantors would <u>remain</u> liable. *See* Chapter 11 Plan (R. 2-5 at 12, ¶ 2.04(b)). The Alleged Debtor contends that, since similar language does not appear in Section 2.12 of the Chapter 11 Plan addressing the "Friends & Family Claims," the guarantors must have been released on those claims. *See* Answer Brief at 9-10. In other words, the Alleged Debtor is arguing that the <u>absence</u> of language saying that the Alleged Debtor would remain liable on his guarantees operates to terminate those obligations; that is, the personal Judgments were satisfied because the Chapter 11 Plan did <u>not</u> say that the personal Judgments would <u>not</u> be satisfied.

This argument is contrary to clearly established law. *Shoaf* held that claims against a nondebtor can only be satisfied through a Chapter 11 plan if the plan contains clear and explicit language providing for such satisfaction. *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987) (describing the language at issue as "clear and unambiguous and its intended effect undisputed"). In *Applewood Chair*, the Court explained that the release in *Shoaf* was clear and explicit, in contrast to general release language, which is not effective to release or satisfy claims against nondebtors. *In re Applewood Chair Co.*, 203 F.3d 914, 918 (5th Cir. 2000). In this case, there is no clear and unambiguous language specifically providing for the satisfaction of the personal obligations of the Alleged Debtor, nor is there any general release language.

In his Answer Brief, the Alleged Debtor concedes that "discharge of a debt by a principal borrower does not affect the liability of guarantors," but argues that the Chapter 11 Plan "did not merely provide for discharge of the debt but 'complete satisfaction.'" Answer Brief at 9. However, the Chapter 11 Plan clearly and unambiguously provides that the "satisfaction" was only for the obligations of Turner Heritage Homes; it did not provide for satisfaction of the personal Judgments against the Alleged Debtor. As in *Applewood Chair*, the Alleged Debtor has not filed an individual bankruptcy petition to seek the protection of the Bankruptcy Code, and in fact he has vigorously opposed the entry of an order for relief in this case. "Thus, our analysis should bear in mind the general rule codified in § 524 [providing in subsection (e) that discharge of a debt of the debtor does not affect the liability of any other entity on such debt]." *Applewood Chair Co.*, 203 F.3d at 918. The obligations of individual third-party guarantors are not affected by a corporate debtor's Chapter 11 proceeding. *United States v. Stribling Flying Serv., Inc.*, 734 F.2d 221, 223 (5th Cir.1984)

The language in the Chapter 11 Plan here is less generous for the Alleged Debtor than other language that has been held <u>not</u> to release nondebtors. Specifically, the language in *Applewood Chair* provided that "[t]he provisions of the confirmed plan shall bind all creditors and parties in interest, whether or not they accept the plan and shall discharge the Debtor, <u>its officers, shareholders and directors</u> from all claims that arose prior to Confirmation." *Applewood Chair Co.*, 203 F.3d at 919 (emphasis added). The court in *Applewood Chair* held this language was <u>not</u> effective to release nondebtors. *Id.* (noting the lack of specific language). The Chapter 11 Plan here does not have this additional release language (which would have been ineffective to release the nondebtors anyway), much less specific language granting a satisfaction to Alleged Debtor Douglas E. Turner.

4

In addition, *Shoaf* held that the discharge of a nondebtor's guaranty obligations is only appropriate when "it has been accepted and confirmed <u>as an integral part of the plan of reorganization.</u>" *Id.* at 1050 (emphasis added).   Far from being "integral," the supposed "satisfaction" of the personal obligations of the Alleged Debtor is never mentioned in the Chapter 11 Plan or Confirmation Order.  The satisfaction of the personal Judgments against the Alleged Debtor can hardly be considered integral when it is totally absent.  There was never any finding in the Chapter 11 Case that any nondebtor releases were integral to the Chapter 11 Plan, which finding would be a necessary prerequisite for any such releases.[4]

Furthermore, contrary to the Alleged Debtor's assertion that "[i]t is abundantly clear that the Bank is essentially conceding that there is a dispute regarding whether any debts were satisfied[,]"Answer Brief at 11, the Bank is <u>not</u> conceding that any debts of any nondebtors were satisfied by the Chapter 11 Plan.  For the reasons explained above, the Chapter 11 Plan clearly provides that only the obligations of Turner Heritage Homes would be satisfied.  The Bank is simply buttressing this conclusion by pointing out that the Bankruptcy Code and case law provide detailed requirements that must be met before the obligations of a nondebtor can be satisfied, released, discharged, or otherwise terminated under a Chapter 11 plan.  *See* Initial Brief at 18.  There are multiple ways that nondebtors could have been granted satisfactions in the Chapter 11 Plan, but none of them were accomplished.  The record is clear that there was never an attempt to meet these requirements in the Chapter 11 Case, and the necessary findings are

---

[4]   As argued in more detail in the next section, at the time the Chapter 11 Plan was confirmed, Petitioning Creditors Burk and Smith held unstayed, final, nonappealable, personal Judgments against the Alleged Debtor.  The Chapter 11 Plan in no way suggests those Judgments would be satisfied.  Rather, the Chapter 11 Plan clearly and unambiguously provides that only the obligations of Turner Heritage Homes would satisfied.  The Alleged Debtor never meaningfully addresses this crucial point.

totally absent from the Confirmation Order. This simply verifies the conclusion, argued above, that the personal Judgments against the Alleged Debtor were not "satisfied."

It is difficult to overstate the adverse impact the Bankruptcy Court's ruling would have on the banking sector and commercial relations generally. As explained by the Fifth Circuit, "[o]ne of the primary purposes of obtaining a guarantor of a note is to provide an alternative source of repayment in the event that the principal obligor's debt is discharged in bankruptcy." *R.I.D.C. Indus. Dev. Fund v. P.L. Snyder*, 539 F.2d 487, 490 n.3 (5th Cir. 1976); *see also N.C.N.B. Texas Nat'l Bank v. Johnson*, 11 F.3d 1260, 1266 (5th Cir.1994) (holding that to allow a confirmed reorganization plan to effect an accord and satisfaction on a loan guaranty "would defeat the purpose of loan guaranties; after all, a lender obtains guaranties specifically to provide an alternative source of repayment in the event that the primary obligor's debt is discharged in bankruptcy") (emphasis added). Here, the plain language of the Chapter 11 Plan provides that only the obligations of Turner Heritage Home would be satisfied by the distributions under the Chapter 11 Plan. The Chapter 11 Plan makes no suggestion that the obligations of any guarantors or any other nondebtors would be satisfied. Allowing guarantors to be released as advocated by the Alleged Debtor would mean that banks could no longer rely on their guarantees, which would have detrimental effects on commercial lending. Such a holding would also likely result in numerous unnecessary objections to bankruptcy plans in the future, as banks would begin to insist on language in Chapter 11 plans explicitly saying that the obligations of the guarantors are not being "satisfied," released, discharged, or otherwise terminated. It would be unnecessary and a waste of judicial resources to require a plan to affirmatively provide for something that is already the law.

In addition, it is fundamentally unfair to give a nondebtor like Douglas Turner the benefit of what is essentially a bankruptcy discharge (regardless of what it is called) without having to

go through the bankruptcy process.   Part of the balance Congress struck in enacting the Bankruptcy Code was a tradeoff:  debtors get a discharge in exchange for full disclosure and distribution of assets to creditors.   As a result of the Bankruptcy Court's ruling here, the Alleged Debtor is in essence receiving the benefit of a discharge without having to distribute or even disclose his assets to creditors.

In sum, the language in the Chapter 11 Plan does not provide for satisfaction of the Judgments against the Alleged Debtor.   The Bank could not object to something the Chapter 11 Plan doesn't say.   The Alleged Debtor is attempting to rewrite the Chapter 11 Plan to provide for the satisfaction of the personal obligations of a nondebtor, which the Chapter 11 Plan clearly does not provide.

### 2.     The Personal Judgments Are Primary Obligations of the Alleged Debtor that Do Not Depend on the Survival of the Claims against Turner Heritage Homes

It is important to keep in mind that the obligations of the Alleged Debtor to the Petitioning Creditors was no longer merely a guaranty at the time the Chapter 11 Plan was confirmed; rather, those guarantees had merged into the Judgments.   The Alleged Debtor asserts that "Appellant never alleged that the Appellee was anything other than a guarantor of Turner Heritage Homes until this appeal."   Answer Brief at 13.   To the contrary, the Bank has asserted throughout this case that the Petitioning Creditors held personal Judgments against the Alleged Debtor.   In fact, the personal Judgments were the very basis for the claims of the Bank and the other Petitioning Creditors in the involuntary Petition itself.   The involuntary Petition states that the "Nature of Claim" was a "Final Default Judgment," "Final Consent Judgment," and "Final Judgment," respectively.   Petition (R. 3-12) at 2.   The personal Judgments were attached to the Bank's Response to Motion to Dismiss (R. 3-6).   During the May 28, 2013 evidentiary hearing, the Bank argued the effect of the "unstayed, nonappealed final judgments."   *See* May 28, 2013

7

Transcript (Doc. 6) at 54. The Bank also argued that the Judgments are "personal liabilities of Douglas E. Turner." *Id.* at 55. On pages 2-3 of the Alleged Debtor's Memorandum of Law (R. 1-9), the Alleged Debtor acknowledges that his liability to the Petitioning Creditors arises from the Judgments. Clearly, the Bank raised the issue that personal Judgments had been entered against the Alleged Debtor prior to confirmation of the Chapter 11 Plan, as well as the effect of those Judgments.

With respect to the merits, the Alleged Debtor argues that this case is more like *Matey v. Pruitt*, 510 So.2d 351 (Fla. 2d DCA 1987) than it is like *BankAtlantic v. Berliner*, 912 So.2d 1260 (Fla. 4th DCA 2005). *See* Answer Brief at 13-14. The Alleged Debtor bases this argument on the assertion that the Chapter 11 Plan "provided for 'complete satisfaction' of debts," and that "the Burk Judgment and Smith Judgment had been fully satisfied." Answer Brief at 13 (emphasis deleted). However, as explained above, the Chapter 11 Plan does not provide for satisfaction of the personal Judgments against the Alleged Debtor; rather, the Chapter 11 Plan provides for the satisfaction of the obligations of Turner Heritage Homes only.

The Chapter 11 Plan also provides that the claims of all of the Petitioning Creditors were "impaired." The term "impaired" is a term of art with particular meaning in the bankruptcy context. *See* 11 U.S.C. § 1124 ("Impairment of claims or interests"). As the Bank explained in detail in its Initial Brief, the classification of the Petitioning Creditors' claims as "impaired" conclusively establishes as a matter of law that those claims were not paid in full based on the *res judicata* effect of the Chapter 11 Plan. *See* Initial Brief at 30-32. Unlike *Matey*, the underlying obligation here has not been paid in full.

In addition, the Alleged Debtor confuses the legal principles at play when a guaranty is converted into a judgment against a guarantor. As the *Berliner* court explained, once the judgment becomes final, the guaranty loses its identity and merges into the judgment. *Berliner*,

8

912 So.2d at 1264.  The guarantor is no longer merely a guarantor, but rather becomes primarily liable on the judgment.  *Id.*   The Alleged Debtor never meaningfully addresses these legal concepts.

In making his argument, the Alleged Debtor relies heavily on *In re Prisuta*, 121 B.R. 474 (Bankr. W.D. Pa. 1990).  However, at least one court has described *Prisuta* as "an aberration in the law."  *In re Norris*, 183 B.R. 437, 454 (Bankr. W.D. La. 1995).  Other courts have observed that "*Prisuta* presents no analytical framework for its conclusion and thus offers little guidance for future cases."  *In re Graber*, 319 B.R. 374, 378 (Bankr. E.D. Pa. 2004); *see also In re Marciano*, 708 F.3d 1123, 1126 (9th Cir. 2013) (rejecting the approach in *Prisuta*).

Even if *Prisuta* were good law, it is clearly distinguishable.  In *Prisuta*, the corporate primary obligor expected to the pay the bank's claims because it had $4 million in unfinished jobs, which would have satisfied the obligations in full.  *Prisuta*, 121 B.R. at 477.  However, the primary obligor was thwarted from being able to complete the jobs because the petitioning creditors "tortiously interfered with [the corporate primary obligor's] contractual rights with others," "seized and unlawfully converted, without obtaining prior court approval, materials which [the corporate obligor] had purchased for specific jobs," "mismanaged completion of these jobs by retaining a contractor to finish the jobs whom they controlled and who lacked the skills required to complete the jobs," and the "petitioning creditors had a right and obligation to collect approximately $1.1 million in accounts receivable but failed to do so."  *Id.*  Based on these facts, the *Prisuta* Court found a bona fide dispute as to the entirety of the debt, not just a portion of it.  None of these egregious facts are present in this case.

**3.    The Alleged Debtor Failed to Carry His Burden to Establish a Bona Fide Dispute**

The Alleged Debtor argues that "[a]pparently, Appellant is maintaining that the Alleged Debtor could not establish a bona fide dispute as to liability or amount unless he provided valuations." Answer Brief at 16. Actually, the Bank is arguing, and the law is clear, that once the petitioning creditors establish a prima facie case that there is no bona fide dispute (as they have here), the burden shifts to the Alleged Debtor to establish a bona fide dispute. *See In re Atlantic Portfolio Analytics & Management, Inc.*, 380 B.R. 266, 273 (Bankr. M.D. Fla. 1999). The Alleged Debtor has not established a bona fide dispute in this case.

The Chapter 11 Plan provides that all of the Petitioning Creditors' claims were "impaired." *See* Chapter 11 Plan at (R. 2-5) at ¶¶ 2.04(c), 2.10(c), and 2.12(c). By definition, as a matter of law, "impaired" claims are claims that are not paid in full. *See* 11 U.S.C. § 1124; *In re Local Union 722 Int'l Brotherhood of Teamsters*, 414 B.R. 443, 452 (Bankr. N.D. Ill. 2009) (explaining that impaired claims are those that are not "paid in full and in accordance with their original terms, including the cure of any defaults"). The provisions of the Chapter 11 Plan are binding on the Alleged Debtor as an equity security holder. *See* 11 U.S.C. § 1141(a). In addition, the Confirmation Order, which confirmed the terms of the Chapter 11 Plan, is res judicata. *See In re Lost Plantation Limited Partnership*, 367 B.R. 878, 883 (Bankr. M.D. Fla. 2007). Accordingly, the Chapter 11 Plan and Confirmation Order conclusively establish that the Petitioning Creditors were not paid in full.

The only evidence that the Alleged Debtor presented to show that the Judgments had been paid in full was vague, nonexpert testimony that the stock "has value." May 28, 2013 Transcript (Doc. 6) at 40. It was clearly erroneous to find that this vague testimony created a bona fide dispute in light of the provisions of the confirmed Chapter 11 Plan. The Chapter 11

Plan provides for a distribution of Phoenix stock aggregating a five (5%) percent equity stake to be shared proportionately by the holders of Class 12 claims (including Petitioning Creditors Burk and Smith). Chapter 11 Plan (R. 2-5 at 15 ¶ 2.12(b)). The five (5%) percent equity stake in Phoenix is equated to be an aggregate payment of $105,175.00. *Id.* (providing that Class 12 can elect to receive common stock in Phoenix aggregating a five (5%) percent equity stake in Phoenix, or an aggregate payment of $105,175.00). This amount is to be shared proportionally with the other Class 12 claimants, which claims were estimated to total approximately $1,051,747.14. The proportional share of Petitioning Creditor Burk (whose Judgment is in the amount of $38,901.29 (R. 3-7)) would be 3.6% of the $105,175.00, or $3,890.14, leaving a deficiency of $35,011.15. The proportional share of Petitioning Creditor Smith (whose Judgment is in the amount of $50,683.76 (R. 3-8)) would be 4.8% of the $105,175.00, or $5,048.40, leaving a deficiency of $45,635.36.

Similarly, the Chapter 11 Plan provides that Class 10 claims (including the unsecured claim of the Bank) would also receive a proportional distribution of Phoenix stock aggregating a five (5%) percent equity stake. Chapter 11 Plan (R. 2-5 at 15 ¶ 2.10(b)). Under the Chapter 11 Plan, the five (5%) percent equity stake in Phoenix is equated to be $105,175.00. *See* Chapter 11 Plan (R. 2-5 at 15 ¶ 2.12(b) (providing for an election between a distribution of common stock in Phoenix aggregating a five (5%) percent equity stake in Phoenix, or an aggregate payment of $105,175.00)). This amount is to be shared proportionally with the other Class 10 claimants, which claims were estimated to total approximately $8,973,000.00. After reducing the Bank's $3,489,142.39 Judgment (R. 3-9) by the value of the real property it received (an agreed value of $1.1 million),[5] the Bank has an unsecured claim in Class 10 in the amount of $2,389,142.30. This amount represents 26.6% of the claims in Class 10, so that the Bank was to receive 26.6%

---

[5] Chapter 11 Plan (R. 2-5 at 14, ¶ 2.04(b)).

11

of the 5% equity stake in Phoenix equated to be worth $105,175.00; that is, a 1.3% equity interest in Phoenix, equated to be worth $28,003.79. This leaves the Bank with a deficiency in the amount of $2,361,138.60. If the Alleged Debtor was contending that a 1.3% interest in a defunct company emerging from bankruptcy fully paid the Bank's undisputed $2,389,142.30 unsecured claim, the burden was on him to put on evidence to that effect. As there is no such evidence, there is no bona fide dispute that the Petitioning Creditors' claims aggregate more than the $15,325 statutory threshold.

In support of its position, the Alleged Debtor relies on *In re Brewer*, No. 6:11-bk-04174-KSJ, 2012 WL 2076421 (Bankr. M.D. Fla. March 25, 2011). *Brewer* is an unpublished Order Denying Creditors Motion for Reconsideration regarding attorneys' fees. The only issue in *Brewer* was the amount of attorneys' fees awarded against the petitioning creditors. Other than one short footnote, in which the Court explains that the alleged debtor had filed a motion in state court to fully satisfy the judgment because certain stock certificates that had been levied and sold were worth more than the judgment, the *Brewer* court did not mention any of the evidence presented during the trial of the involuntary petition or explain why it found the existence of a bona fide dispute. *See Brewer*, 2012 WL 2076421 at *2 n.14. The *Brewer* case cited by Defendants is therefore of little assistance in resolving the issues in this case.

The weakness of the Alleged Debtor's argument is demonstrated by his attempt to fill in facts that do not actually appear in the *Brewer* opinion by referring to pleadings filed in that case, in particular a Brief in Opposition to Dismiss Involuntary Bankruptcy. *See* Exhibit B to Alleged Debtor's Memorandum of Law in Support of Its Motion to Dismiss (R. 1-11, "*Brewer* Brief"). Nevertheless, these pleadings demonstrate that *Brewer* is factually distinguishable. First, the levy and sale of the stock certificates in *Brewer* was not done pursuant to a Chapter 11 plan that specifically provides that the claims receiving the stock are "impaired." Second, there was

12

evidence presented in *Brewer* showing that the value of the stock was <u>greater than the amount of the judgment</u>. *See Brewer* Brief at 7-9 (citing the alleged debtor's brief (which is not part of the record) to say that the alleged debtor had filed a motion in state court to <u>satisfy the judgment in full</u> because the value of the stock <u>exceeded the amount of the judgment</u>). Third, the alleged debtor in *Brewer* had counterclaims and presented evidence showing that the amount of the counterclaims would setoff the amount of the petitioning creditor's claim. *See Brewer* Brief (R. 1-11 at 10). Fourth, the involuntary petition in *Brewer* was filed by only one petitioning creditor, an insufficient number under § 303(b)(1). *See* Exhibit A to Alleged Debtor's Memorandum of Law (R. 1-10, "*Brewer* Petition"). Fifth, perhaps most importantly, <u>prior to the filing of the involuntary petition</u>, the alleged debtor in *Brewer* had filed a motion in the state court to satisfy the judgment *in toto. Brewer*, 2012 WL 2076421 at *2 n.14; *Brewer Brief* at 7 (indicating that the motion had been filed in the state court on February 22, 2011); *Brewer* Petition at 1 (indicating that the original involuntary petition had been filed on March 25, 2011). For the foregoing reasons, the *Brewer* opinion does not address the issues in this case and in any event is factually dissimilar.

The Alleged Debtor failed to carry his burden to create a bona fide dispute. The only evidence submitted by the Alleged Debtor was vague testimony that the Phoenix stock "has value." It was clearly erroneous to find that this created a bona fide dispute in light of the amounts of the Petitioning Creditors' claims as set forth in the Judgments, as well as the provisions of the Chapter 11 Plan and Confirmation Order, which contained conclusive findings that all of the Petitioning Creditors' claims were impaired and not paid in full. If the Alleged Debtor was arguing that the Bank's $2,389,142.30 unsecured claim was paid in full, the burden was on him to show a bona fide dispute on that point. Vague testimony that the stock "has value" is insufficient. To the extent that the Bankruptcy Court put the burden on the Petitioning

Creditors to show the value of the stock, the burden was placed on the incorrect party, and it should have been on the Alleged Debtor to show a bona fide dispute that the aggregate amount of the Petitioning Creditors' claims was less than the statutory threshold.

### 4.   The Bank Has Shown Special Circumstances Warranting the Entry of an Order for Relief

Even if the claims of Petitioning Creditors Burk and Smith are disqualified, the Bank can still obtain relief as a single petitioning creditor under the doctrine of "special circumstances." The doctrine of special circumstances provides that relief can be ordered in appropriate involuntary cases, even if there is only one petitioning creditor, instead of three, as required by § 303(b)(1), when there are special circumstances such as fraud.  *See In re General Trading, Inc.*, 87 B.R. 216, 219 (Bankr. S.D. Fla. 1988).

The Alleged Debtor argues that the Bank "never raised" the special circumstances argument in the proceedings below.  Answer Brief at 22.  To the contrary, the Bank raised this issue in its Response to Motion to Dismiss (R. 3-6) and attached to the Response to Motion to Dismiss deposition testimony in which the Alleged Debtor admitted to transferring more than $1 million to an offshore trust.  July 23, 2012 Deposition Transcript (R. 3-10) at 14-17.  The Bank also raised this argument during the May 28, 2013 evidentiary hearing.  May 28, 2013 Transcript (Doc. 6) at 9, 19.  The Alleged Debtor addressed the transfers to the offshore trust in his closing argument.  May 28, 2013 Transcript (Doc. 6 at 46-47).

The Alleged Debtor asserts that the deposition testimony was not properly presented to the Bankruptcy Court, relying on Rule 32, Federal Rules of Civil Procedure ("Rules").  *See* Answer Brief at 22-23 (summarily asserting that "there is no basis under subsections 2 through 8 [of Rule 32(a)] for the Appellant to offer the deposition testimony as substantive evidence").  However, Rule 32(a)(3) provides that "[a]n adverse party may use for <u>any</u> purpose the deposition

14

of a party . . . ." Fed. R. Civ. P. 32(a)(3) (emphasis added). In addition, "[a] deposition, lawfully taken and, if required, filed in any federal- or state-court action may be used in a later action involving the same parties . . . to same extent as if taken in the later action." Fed. R. Civ. P. 32(a)(8).

Accordingly, the special circumstances argument was raised in the proceedings below. Response to Motion to Dismiss (R. 3-6 at 3); May 28, 2013 Transcript (Doc. 6 at 19, 55). The Bankruptcy Court clearly erred in failing to find special circumstances. It should be noted that this issue is relevant only if the Court holds that the distributions under the Chapter 11 Plan fully paid the Burk Judgment and Smith Judgment. If these personal Judgments against the Alleged Debtor were <u>not</u> paid in full by the distributions under the Chapter 11 Plan (which they were not for the reasons argued above), then Petitioning Creditors Smith and Burk still have claims against the Alleged Debtor based on the Judgments. Those claims, when aggregated with the Bank's claim, clearly exceed $15,325. *See* Initial Brief at 29-33.

### 5.    The Alleged Debtor's All-Or-Nothing Approach for Determining a Bona Fide Dispute as to Amount Is Incorrect

The Alleged Debtor argues that this Court need not determine the correct legal test for determining whether there is a bona fide dispute for two reasons. First, the Alleged Debtor contends that the Burk Judgment and Smith Judgment were fully satisfied as part of the Chapter 11 Plan, so that there is a bona fide as to the Alleged Debtor's liability on those Judgments. Answer Brief at 18. However, as explained above, the Chapter 11 Plan of Turner Heritage Homes did <u>not</u> fully satisfy or fully pay the personal Judgments against the Alleged Debtor.

Second, the Alleged Debtor incorrectly contends that the Bankruptcy Court did not have valuations of the Phoenix stock or the real property. The Chapter 11 Plan established the value

of the real property at an agreed value of $1.1 million.[6]  Chapter 11 Plan (R. 2-5 at ¶ 2.04(b)).

Contrary to the Alleged Debtor's assertion that the value of the real property was "contested,"

Answer Brief at 20, the Alleged Debtor's own witness testified that there was "an agreed

valuation between the parties . . . for purposes of the plan we agreed to the $1.1 million."  May

28, 2013 Transcript (Doc. 6 at 35, 43) (acknowledging that "the plan as confirmed called for $1.1

to be placed on the value of the property").  The Alleged Debtor argued in his closing argument

during the May 28, 2013 evidentiary hearing that "[t]hey'd already agreed to an amount of 1.1

[million]."  May 28, 2013 Transcript (Doc. 6 at 49).  When the Bank's Judgment in the amount

of $3,489,142.39 is reduced by the agreed value of the real property, the Bank has an unsecured

claim in the amount of $2,389,142.30.  As for the stock, the Chapter 11 Plan specifically

provides that the claims of the Petitioning Creditors were "impaired," thus conclusively

establishing as a matter of law that the stock did not pay the Petitioning Creditors's claims in

full.  The Bank's unsecured claim undisputedly exceeds $2 million, which obviously was not

fully paid by a 1.3% equity interest in a defunct company emerging from bankruptcy, as more

fully explained above at pages 10-12.  If the Alleged Debtor was contending that it was, the

burden was on him to put on evidence to that effect.  Nonexpert testimony that the stock "has

value" is insufficient.

As the Bank argued in its Initial Brief at 23-29, the Alleged Debtor's proposed legal test

for determining whether there is a bona fide dispute as to amount has been widely criticized and

---

[6]  The Alleged Debtor asserts that "Appellant later contradicts itself [when it argued that the Alleged Debtor failed to carry his burden of showing a bona fide dispute], arguing that the land was valued at $1,100,000 under the Chapter 11 Plan, which was presented into evidence by the Appellee."  Answer Brief at 16 n.3.  To the contrary, the Bank is arguing that the burden has shifted to the Alleged Debtor to establish a bona fide dispute under § 303.  To the extent that the Alleged Debtor is attempting to establish a bona fide dispute by arguing that the Bank received real property and stock under the Chapter 11 Plan to "fully satisfy" the Alleged Debtor's obligations, the undisputed evidence shows that the Chapter 11 Plan conclusively establishes the value of the real property, and that the distributions of real property and Phoenix stock did not pay the Judgments in full.  See Initial Brief at 29-33.  The Alleged Debtor has not established a bona fide dispute as to the amount of the Petitioning Creditors' claims, or the Alleged Debtor's liability thereon.

should be rejected. The Alleged Debtor attempts to soft-peddle the harsh and unreasonable results of the all-or-nothing approach. *See* Answer Brief at 20. Despite the Alleged Debtor's protestations, the fact is that the approach advocated by the Alleged Debtor would result in a creditor being denied relief under § 303 when the undisputed portion of the claim exceeds the $15,325.00 statutory threshold, as it clearly does here, as explained above. *See also* Initial Brief at 32-33. The Alleged Debtor recognizes this when he argues that "there is good reason to find that a bona fide dispute as to <u>any</u> material amount, <u>even if the undisputed portion exceeds $15,325</u>, warrants dismissal of an Involuntary Chapter 7 proceeding." Answer Brief at 20 (emphasis added). This is precisely the unreasonable result that should be rejected. This all-or-nothing approach is contrary to the language of the statute and Congressional intent. *See* Initial Brief at 23-29.

The Alleged Debtor further argues in favor of the all-or-nothing standard based on the "serious consequences" for involuntary alleged debtors. *See* Answer Brief at 20-21. But there are serious consequences for petitioning creditors, as well. Under § 303(i), if the involuntary petition is dismissed, the petitioning creditors are subject to liability for the alleged debtor's costs and attorneys' fees, and potentially consequential damages and punitive damages. There are serious consequences for all parties involved. That is precisely why Congress developed the detailed statutory requirements set forth in § 303. Still, Congress has made the bankruptcy framework available to creditors when the requirements of § 303 are met. In light of the serious consequences involved, the question here is who should bear those adverse consequences: the Alleged Debtor, who has personal liability on personal Judgments that have not been fully satisfied, and who has admitted to transferring more than $1 million to an offshore trust; or the Petitioning Creditors whose aggregate claims exceed the statutory minimum amount in § 303.

## CONCLUSION

For the foregoing reasons, the Bank respectfully requests that this Court reverse the Order of the Bankruptcy Court and remand this case with instructions to enter an order for relief under § 303.

Respectfully submitted this 24th day of October, 2013.

> /s/ Jacob D. Flentke
> _____
> Jacob D. Flentke, Esq.
> Florida Bar No. 25482
> Divine & Estes, P.A.
> P.O. Box 3629
> Orlando, Florida 32802-3629
> Phone: (407) 426-9500
> Fax: (407) 426-8030
> E-Mail: jflentke@divineestes.com
> Counsel for Farmers and Merchants Bank

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of October, 2013, a true and correct copy of the foregoing was provided electronically via the Court's CM/ECF system or by U.S. Mail to the following: the Alleged Debtor, Douglas E. Turner, c/o Ronald A. Mowrey, Esq., (rmowrey@mowreylaw.com), Mowrey Law Firm, P.A., 515 North Adams Street, Tallahassee, FL 32301-1111; Farmers & Merchants Bank c/o Ethan Andrew Way, Esq., (ethan@waylawfirm.com), Gillis Way LLP, P.O. Box 10017, Tallahassee, FL 32302; Tema Burk, TTE, c/o William R. Wohlsifer, Esq., (William@wohlsifer.com), William R. Wohlsifer, PA, 1100 East Park Ave., Suite B, Tallahassee, FL 32301; Susan C. Smith c/o Timothy Bruce Elliott, Esq. (tim@smithlawtlh.com), Smith & Associates, 2834 Remington Green Circle, Tallahassee, FL 32308; and U.S. Trustee, United States Trustee, 110 E. Park Avenue, Suite 128, Tallahassee, FL 32801.

> /s/ Jacob D. Flentke
> _____
> Jacob D. Flentke, Esq.
> Florida Bar No. 25482